**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Calvin L. QUINN, Defendant–Appellant.**

**No. 89–5795.**

United States Court of Appeals,
Sixth Circuit.

Submitted Jan. 23, 1990.

Decided April 24, 1990.

W. Hickman Ewing, Jr., U.S. Atty., Timothy R. DiScenza, and John Fowlkes, Asst. U.S. Attys., Office of the U.S. Atty., Memphis, Tenn., for plaintiff-appellee.

Barry A. Wiener, Memphis, Tenn., for defendant-appellant.

Before WELLFORD and GUY, Circuit Judges; and ENGEL, Senior Circuit Judge.

ENGEL, Senior Circuit Judge.

Appellant Calvin Quinn and his codefendant, James Taylor, Jr., were convicted of aiding and abetting each other in the possession, with intent to distribute, of a Schedule II controlled substance (cocaine), in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Judgment was entered on April 5, 1989, by the United States District Court for the Western District of Tennessee.

On appeal, Quinn assigns several errors to the district court, and particularly objects to the admission at trial of a witness' suppression hearing testimony under Fed. R.Evid. 804(b)(1), the "former testimony" exception to the hearsay rule. We conclude that the Government did not satisfy its burden to demonstrate the "unavailability" of the witness and that the admission of this testimony violated Quinn's rights under the Confrontation Clause of the Sixth Amendment. *See Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Further, the admission of the testimony was not "harmless beyond a reasonable doubt." *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). For the reasons that follow, we reverse Quinn's conviction and

remand to the district court for proceedings consistent with this opinion. Under the authority of *Lockhart v. Nelson,* 488 U.S. 33, 109 S.Ct. 285, 287, 102 L.Ed.2d 265 (1988), we have considered the challenged testimony in reviewing the sufficiency of the evidence under *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Our conclusion that there is sufficient evidence on the record indicates that the Double Jeopardy Clause does not preclude retrial.

I.

On July 26, 1988, Officer Edward Cash of the Memphis Organized Crime Unit and other officers executed a search warrant for James Taylor's apartment at 4164 Rainwood, Apartment 3, in Memphis, Tennessee. Because of construction on the building and the removal of the identifying numbers on the apartment doors, the officers erroneously forced entry into a wrong apartment, which was on the second floor of the apartment building. They thereafter proceeded to the correct apartment on the same floor, knocked on the door, and were met by a woman, later identified as Sharon Braxton, and her minor child. This residence was subsequently searched. Officer Mary Coats Johnson testified that she found cocaine and a digital scale in a multicolored athletic bag on the top of a television set. In the bag were thirty-nine packets of cocaine weighing 1,142 grams.

Shortly after the initial entry into the wrong apartment, two officers of the Memphis Police Department, Officers Colburn and Clark, arrived on the scene. The officers were responding to a "prowler call," which apparently resulted from the erroneous forced entry into the first apartment, but later found that the narcotics officers were in the process of executing the search warrant. Officer Clark testified that while he and another officer were outside the first apartment, Quinn and Taylor came up the steps to the second floor apartments. When the officers asked if they lived in the first residence where forced entry had been made, Taylor indicated that he did not live at that apartment, but lived at the next

apartment. As the officers and defendants walked to the second apartment, the defendants were informed that other officers were serving a search warrant on Taylor's apartment. Officer Clark testified that when he knocked on the door of the apartment, Quinn, still outside the apartment, jumped from the second story balcony. Quinn later was found hiding in a large hole in a field and was taken into custody after a struggle. The officers then brought Quinn back to the apartment and Quinn, Taylor, and Sharon Braxton were placed under arrest. According to the Government's brief, Sharon Braxton "was released after it was determined that she had no part in the possession or distribution of cocaine."

On July 27, 1988, a federal grand jury returned a one count indictment charging Quinn and Taylor with aiding and abetting each other in the possession of approximately 1,142 grams of cocaine, with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. On August 30, 1988, Taylor filed a motion to suppress the evidence seized pursuant to the search warrant. Quinn joined this motion.[1]

On September 14, 1988, the district court held a hearing to consider the motion to suppress. During the course of that hearing, Sharon Braxton, called by Taylor as a witness, testified that she had gotten home before Taylor on the day of the search. She testified that Quinn had brought the athletic bag to the apartment at 5:00 or 6:00 in the evening. She also testified that shortly before the officers arrived, Quinn and Taylor left the apartment to get food. On cross-examination, she admitted that she had a relationship with Taylor. She also testified that although she had seen Quinn with the athletic bag she did not know that it contained cocaine. On September 20, 1988, the district court denied the motion to suppress.

On March 8, 1989, the Clerk set this case for trial on April 3, 1989, and set the Report Date for March 16, 1989. On that Report Date, all parties announced they were ready for trial. The jury trial of both defendants began as scheduled on April 3, 1989. On the second day of trial, April 4, 1989, the Government informed the district court that Braxton could not be found and requested the introduction of her suppression hearing testimony. Counsel for Quinn objected strenuously.

The Government presented the following testimony on the Government's efforts to locate Sharon Braxton. On Wednesday, March 29, 1989, the Government issued a subpoena for Sharon Braxton. Robert O'Banner of the U.S. Marshals Service testified that his office received it on Thursday, March 30, 1989. The district court asked O'Banner whether this is "less time or more time or about the same time that you usually get these subpoenas?" O'Banner stated that "[t]his was fairly short notice, Judge. Normally we would like at least five working days." When the district court asked how many times he gets five working days, O'Banner responded: "Most time we'll get them in with that amount of time, because they'll explain to the attorneys that we actually need to go out there. We need that, plus we try to get a working address on people that's employed so we can get them during working hours."

O'Banner also testified that on Thursday, March 30, he went to 3194 Steele, Number 1, the address Braxton gave at the suppression hearing, but found that "these apartments had one door that's completely locked." He testified that he determined which apartment was Number 1 and pounded on the window. He said that he "got no one to come to the door, and I wasn't sure if anyone was there."

On Friday, March 31, O'Banner returned to the complex and found no one at the

---

**1.** Quinn argues in passing that the district court erroneously admitted the testimony from the suppression hearing because he lacked standing to oppose admission of the seized evidence, lacking any relationship to the searched premises. The district court dismissed the argument since Quinn's counsel actively participated in the hearing. We need not address this issue since we hold that the Government did not satisfy its burden to demonstrate the unavailability of the witness.

manager's office, but accessed the corridor with the help of someone who was working at the complex. He said he "beat the door fairly hard" and left a U.S. Marshal sticker on the door. O'Banner also testified that on Monday, April 3, the first day of the trial, he went back to the apartment. He found no one home, but talked to a woman washing her vehicle, who stated that Braxton had moved away about a month ago.

The Government also called Officer Cash. Officer Cash testified that he "had been tied up in Federal Court all last week" and that "[d]uring the weekend I didn't have the time to go out and try to locate this particular person." He also testified that he had received information "last night," *i.e.*, the night of April 3, that Sharon was living at 261 Keel, Apartment 3. Beula Braxton, Sharon's mother, lived at that address. Officer Cash testified that he went out to the address on the night of April 3, at 12:30 a.m. He verified that Sharon's car was still registered in her name, but testified that he did not see it when he drove by her mother's home.

Officer Cash also testified that at approximately 7:45 in the morning on Tuesday, April 4, he

... called over to the residence, and I spoke to an elderly, what sounded like an elderly, female. And she identified herself as Beula Braxton, and I did have a conversation with her. She advised that Sharon was not there; however, she was

expecting her back later on this evening and that she would pass that information on to her.

The officer also testified that her mother "advised me that the daughter is gone and that she is in and out of the house and that she did not know where she was living at the time." Officer Cash also answered in the negative to the following questions:

Q: You didn't leave a message that you were looking for her to appear in Court? You didn't tell her what your purpose was?

A. No, sir.

Q: You just said you were looking for her. You didn't give any purpose?

A. No, sir.

After receiving the above testimony, the district court concluded that the Government demonstrated a good faith effort to locate and present the witness and that Quinn had an opportunity and similar motive to develop Braxton's testimony at the suppression hearing. The district court overruled vigorous objections by Quinn's counsel and admitted Braxton's statements under Fed.R.Evid. 804(b)(1).

The Government introduced portions of the transcript from the suppression hearing through a court reporter. Braxton's statements indicated that Quinn brought the athletic bag into the apartment on the evening of the arrest.[2] Braxton's suppres-

**2.** The portions of Braxton's suppression hearing statements which were admitted are reproduced in their entirety. The ellipses represent portions of the suppression hearing testimony that were not admitted.

*SHARON BRAXTON*
Having been first duly sworn, was examined and testified as follows:
*DIRECT EXAMINATION*
BY MR. FITZGERALD: [Taylor's counsel].
Q. Would you please state your name for the record?
A. My name is Sharon Braxton.
....
A. Sharon, SHARON, Braxton, BRAXTON.
....
Q. (By MR. FITZGERALD) And where do you reside, Ms. Braxton?
A. Sir?
....
Q. At the time this arrest took place, where were you living?

A. 4164 Rainwood, Apartment 3.
Q. And who do you live in that apartment with?
A. James Taylor, Jr., Janice Taylor and Latrivicia Braxton.
Q. Do you remember the day that—Let's think back to July [26]. Do you remember that day?
A. Yes.
....
[Examination by the Government]
Q. Ms. Braxton, on the day of the arrest, July [26th], you knew that cocaine was in the house, did you not?
A. No, I didn't.
....
[Examination by Quinn's Counsel.]
Q. When did you say that Mr. Quinn brought the bag over there?
A. When did he bring it?
Q. Yes.
A. The day that they came with the search warrant.

sion hearing testimony was the only evidence introduced by the Government which connected Quinn to the athletic bag and placed him in the apartment before the arrest. After the Government rested, Quinn's counsel offered no proof, but moved under Fed.R.Crim.P. 29 for a judgment of acquittal, which was denied by the district court. The jury subsequently returned guilty verdicts on April 5, 1989. Quinn was sentenced to 63 months incarceration and a 3–year supervised release.

On appeal, Quinn argues that (1) the district court erred in admitting the transcript of Braxton's testimony from the suppression hearing, (2) there is insufficient evidence to support his conviction, and (3) the district court made prejudicial comments during closing arguments.

## II.

■ The primary issue in this appeal is whether the Government failed to lay a proper foundation for the admission of Braxton's suppression hearing testimony. The prosecution bears the burden of demonstrating "unavailability" before a witness' out of court statement may be admitted. *Ohio v. Roberts,* 448 U.S. 56, 74–75, 100 S.Ct. 2531, 2543–44, 65 L.Ed.2d 597 (1980). The preference for face to face confrontation as a means to satisfying the Confrontation Clause of the Sixth Amendment[3] perhaps was stated best in *Barber v. Page,* 390 U.S. 719, 721, 88 S.Ct. 1318, 1320, 20 L.Ed.2d 255 (1968). The Supreme Court summarized the Confrontation Clause jurisprudence:

> Many years ago this Court stated that "[t]he primary object of the [Confrontation Clause of the Sixth Amendment] ... was to prevent depositions or *ex parte* affidavits ... being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox v. United States,* 156 U.S. 237, 242–243 [15 S.Ct. 337, 339–340, 39 L.Ed. 409] (1895). More recently, in holding the Sixth Amendment right of confrontation applicable to the States through the Fourteenth Amendment, this Court said, "There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas,* 380 U.S. 400, 405 [85 S.Ct. 1065, 1068, 13 L.Ed.2d 923] (1965). See also *Douglas v. Alabama,* 380 U.S. 415 [85 S.Ct. 1074, 13 L.Ed.2d 934] (1965). [*Barber v. Page,* 390 U.S. at 721, 88 S.Ct. at 1320.]

The Court also recognized that "there has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant." *Barber v. Page,* 390 U.S. at 722, 88 S.Ct. at 1320

Q. What time of the day?
A. It was about—It was about ten o'clock that night or nine, somewhere that night.
Q. It was nine or ten you said?
A. It was about nine or ten. They was already there. It was about nine or ten when they arrived, when the police arrived.
....
Q. [By Quinn's counsel] My question is what time did you say Mr. Quinn brought the bag by there?
A. It was that evening around five or six. It was in the evening time.
Q. Did Mr. Quinn stay at that time?
A. Yes, he did.

Q. How long did he stay?
A. From the time I left, they was still there when I got back. So they was there when the police—They left my house about I'd say between 9:00 and 10:00. I mean somewhere before they left for like 15 minutes before the police arrived. They left my house. They went to get me some chicken.

**3.** The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."

(citing *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895)). The exception "has been explained as arising from necessity and has been justified on the ground that the right of cross-examination initially afforded provides substantial compliance with the purposes behind the confrontation requirement." 390 U.S. at 722, 88 S.Ct. at 1320 (citations omitted). The exception and the "unavailability" predicate has been articulated not only in Supreme Court jurisprudence but in the Federal Rules of Evidence.[4]

In *Roberts*, 448 U.S. at 65, 100 S.Ct. at 2538, the Supreme Court articulated a two-pronged test for determining the admissibility under the Confrontation Clause of a declarant's out of court statement. First, in the "usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." 448 U.S. at 65, 100 S.Ct. at 2538 (citations omitted). The second prong, which only "operates once a witness is shown to be unavailable," involves an inquiry into whether a statement is accompanied by adequate "indicia of reliability." 448 U.S. at 66, 100 S.Ct. at 2539 (quoting *Mancusi v. Stubbs*, 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972)). The Supreme Court has stated that "[r]eliability can be inferred without more in a case where evidence falls within a firmly rooted hearsay exception." *Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539. Since we conclude that the Government did not satisfy its burden to demonstrate Braxton's "unavailability," we need not consider conclusively whether her testimony at the suppression hearing bears sufficient indicia of reliability or was admissible as "former testimony" under Fed.R.Evid. 804(b)(1).

In discussing the "unavailability" predicate, the Supreme Court stated in *Roberts* that a "witness is not 'unavailable' for purposes of ... the exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial." *Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543 (supplying the emphasis) (quoting *Barber v. Page*, 390 U.S. 719, 724–25, 88 S.Ct. 1318, 1321–22, 20 L.Ed.2d 255 (1968)). The Court further discussed this burden:

> The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. "The lengths to which the prosecution must go to produce a witness ... is a question of reasonableness."

---

4. Federal Rule of Evidence 804 provides, in part:

**Rule 804. Hearsay Exceptions; Declarant Unavailable**

**(a) Definition of unavailability.** "Unavailability as a witness" includes situations in which the declarant—

(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or

(2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so; or

(3) testifies to a lack of memory of the subject matter of the declarant's statement; or

(4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

(5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivisions (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means.

A declarant is not unavailable as a witness if exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying.

**(b) Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

**(1) Former testimony.** Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

. . . .

*California v. Green,* [399 U.S. 149, 189, n. 22 [90 S.Ct. 1930, 1951, n. 22, 26 L.Ed.2d 489] (1970) ] (concurring opinion, citing *Barber v. Page, supra* ). The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate. [*Roberts,* 448 U.S. at 74, 100 S.Ct. at 2543.]

In *Roberts,* the prosecutors had been in touch with the witness' parents some four months prior to the trial to ascertain her whereabouts. The evidence indicated that the prosecutor had served subpoenas at her parents' home on five separate occasions over a period of several months. Further, the witness' mother testified that her daughter was traveling outside of Ohio, that she had not heard from her in over a year and that she and her family knew of no way to reach the witness even in an emergency. *See* 448 U.S. at 75, 100 S.Ct. at 2542. In *Roberts,* the Court held that the Supreme Court of Ohio correctly concluded that the witness was unavailable.

Although the "good faith" and "reasonableness" standards articulated in *Roberts,* of course, are not subject to exact definition, it is clear here that the Government did not comply. As the Supreme Court stated, the "ultimate question is whether the witness is unavailable despite good-faith efforts undertaken *prior to trial.*" *Roberts,* 448 U.S. at 74, 100 S.Ct. at 2543 (emphasis supplied). Even considering those acts after as well as prior to trial, the Government's efforts were insufficient.

Officer O'Banner testified that he received the subpoena on the Thursday before the Monday trial. The late notice is not justifiable because the trial date had been set a month before. This lateness, compounded by the intervening weekend, falls far short of the five *working* days that O'Banner testified he generally required to locate a witness. Despite this late notice, the ensuing effort was negligible, perhaps due in part to the unreasonable time constraints placed upon the Marshal's office. On Thursday, O'Banner pounded on the window of the apartment. On Friday, he left a Marshal's sticker, tried to talk to the manager, and was informed by a woman washing her car that Braxton had moved about a month ago. Nothing was done during the weekend.

Officer Cash testified that he was "informed" on the night of April 3, the first day of trial, that Sharon was at her mother's. Even then, he merely drove by her house to check for Sharon's car; he did not testify that he stopped or called that night. He did call the next morning, however, and was told that Sharon was "in and out of the house" and would be in that evening. No testimony was offered that any county or city records were checked, that anyone tried to follow-up on the manager of the apartment building for a forwarding address, or that anyone tried to check with relatives prior to the trial. Further, it would appear that no one checked with any possible employers even though Braxton testified at the suppression hearing that she was employed. While we decline to attribute bad faith to the Government's effort, we are compelled to observe that it was singularly unenthusiastic.

The conclusion that the Government has not satisfied its burden here is reinforced by the crucial nature of Braxton's testimony to the Government's case. We cannot conclude that the admission of the testimony was "harmless beyond a reasonable doubt." *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The Government offered no other evidence that would have linked Quinn to the athletic bag and, indeed, there was no other evidence before the jury that Quinn was in the apartment earlier or might otherwise have been in constructive possession of the apartment and its contents.

Perhaps most important, the credibility of Braxton's testimony was highly suspect. Braxton was the girlfriend of Taylor, Quinn's codefendant. She had a strong motive for shifting blame away from herself and Taylor and therefore, of necessity, upon Quinn. Further, although the

Government asserts in the briefs that Braxton "had no part in the possession or distribution of cocaine," it would appear that her potential complicity in the drug operation would give her another strong motive to shift any blame away from herself or Taylor. We mention these possible motives not to impugn the credibility of Braxton, since credibility determinations are left to the trier of fact, but to stress the importance of the jury's opportunity to assess the demeanor of this particular witness. This was a case where the underlying importance of personal confrontation before the jury, stressed by the Sixth Amendment, was abundantly important.

As best stated by Judge Wade H. McCree, Jr., Confrontation Clause considerations "are especially cogent when the testimony of a witness is critical to the prosecution's case against the defendant." *United States v. Lynch*, 499 F.2d 1011, 1022 (D.C.Cir.1974). There the District of Columbia Circuit held that the district court committed prejudicial error in admitting preliminary hearing testimony, noting that "although the dangers of hearsay are mitigated to some extent by the safeguards of the oath and the opportunity to cross-examine in the former tribunal, the prior testimony should be admitted only when the witness is in fact 'unavailable.'" *Lynch*, 499 F.2d at 1022; *see also United States v. Rothbart*, 653 F.2d 462, 466 (10th Cir.1981) (trial court committed reversible error in admitting deposition where it was a substantial part of the Government's case in

chief and the Government failed to demonstrate a good faith effort); *United States v. Mann*, 590 F.2d 361, 367 (1st Cir.1978) (trial court committed reversible error in admitting a deposition of a witness who was "vital" to the Government's case; the "government did not make as vigorous an attempt to secure the presence of the witness as it would have made if it did not have the prior recorded testimony"). Because we cannot say that the admission of this testimony was harmless, we are obliged to reverse.

### III.

Quinn argues on appeal that there was insufficient evidence to support his conviction and that the court further erred in denying his motion, made under Fed.R. Crim.P. 29, for a judgment of acquittal. Under *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1978), we must review "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[5] Quinn essentially argues that if the trial court erred in the admission of the deposition testimony of Sharon Braxton, and it must therefore be disregarded, the remainder of the evidence was insufficient as a matter of law to support his conviction and he is entitled to an acquittal instead of a new trial.

> [W]hen a defendant challenging his conviction on appeal contends both that the trial was infected by error and that the evidence was constitutionally insufficient, the court may not, consistent with *Burks v. United States*, 437 U.S. 1 [98 S.Ct. 2141, 57 L.Ed.2d 1] (1978), ignore the sufficiency claim, reverse on grounds of trial error, and remand for retrial. Because the first trial has plainly ended, "retrial is foreclosed by the Double Jeopardy Clause if the evidence fails to satisfy the [constitutional standard for sufficiency]." Hence, the [sufficiency] issue cannot be avoided; if retrial is to be had, the evidence must be found to be legally sufficient, as a matter of federal law, to sustain the jury verdict.
>
> 466 U.S. 294, 321–22, 104 S.Ct. 1805, 1820, 80 L.Ed.2d 311 (1984) (Brennan, J., concurring) (citations omitted).

**5.** The reversal on trial error here does not necessarily obviate the need to review the sufficiency of the evidence. In *Delk v. Atkinson*, for example, this court observed that "[s]everal courts including this one have indicated that where it is claimed on appeal from a federal conviction that the evidence was insufficient, the reviewing court is required to decide the sufficiency question even though there might be other grounds for reversal which would not preclude retrial." 665 F.2d 90, 93 n. 1 (6th Cir.1981) (citing, *inter alia, United States v. Orrico*, 599 F.2d 113, 116 (6th Cir.1979)); *cf. United States v. Aarons*, 718 F.2d 188, 189 n. 1 (6th Cir.1983) ("Where the sufficiency of the evidence is properly before us, we consider that issue first because it is determinative of whether the appellant may be retried."); *see also* Justice Brennan's concurrence in *Justices of Boston Municipal Court v. Lydon*:

If, as we have held, Braxton's testimony was inadmissible as such and should not have been presented to the jury, then it is evident that the remaining evidence before the jury, even construed most favorably to the government, *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), was altogether insufficient to prove the essential elements of the crime of possession of cocaine with intent to distribute.[6] Without Braxton's testimony the only proof which remained was the testimony of the officers summarized earlier, concerning the search of Braxton's apartment and the location of the cocaine in an athletic bag. Codefendant Taylor did not testify. There was no evidence before the jury, with or without Braxton's testimony, that Quinn had any possessory interest in the apartment which might have supported a constructive possession charge. Likewise, without Braxton's testimony there is no evidence that he was ever in her apartment since the only evidence as to Quinn was his arrival at the *outside* of the apartment with codefendant Taylor.

It is true, of course, that Quinn did leap over the balcony outside the apartment and attempt to escape just as the officers were entering the apartment, but there is no evidence placing him inside the apartment at that time or earlier. While his attempted escape was undoubtedly admissible as evidencing guilty knowledge, evidence of flight, by itself, is altogether insufficient to demonstrate any kind of possession on Quinn's part. *See United States v. Craig*, 522 F.2d 29, 32 (6th Cir.1975). Even assuming the jury could infer from his flight that Quinn knew that there was cocaine in the apartment, and assuming that there was a sufficient quantity of cocaine from which an intent to distribute on somebody's part could be inferred, there is still no evidence of Quinn's actual or constructive possession of the drug or of his aiding and abetting Taylor's possession. If, therefore, the constitutional sufficiency under *Jackson v. Virginia* of the evidence at trial had to be measured upon that which was properly admissible, it would necessarily follow that under *Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 2151, 57 L.Ed.2d 1 (1978), principles of double jeopardy would preclude retrial.

The question presented here, then, is whether we may consider the erroneously admitted testimony, as well as the properly admitted evidence, in reviewing the sufficiency of the evidence. This issue has been recently decided in the affirmative by the Supreme Court in *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). In *Lockhart*, the Court concluded that "where the evidence offered by the State and admitted by the trial court— whether erroneously or not—would have been sufficient to sustain a jury verdict, the Double Jeopardy Clause does not preclude retrial" 109 S.Ct. at 287. In so holding, the Supreme Court plainly concluded that the Double Jeopardy Clause's general prohibition against successive prosecutions does not necessarily prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction. More directly controlling here was the observation of Chief Justice Rehnquist in *Lockhart*, following an analysis of *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978):

> *Burks* was careful to point out that a reversal based solely on evidentiary insufficiency has fundamentally different implications, for double jeopardy purposes, than a reversal based on such ordinary "trial errors" as the "incorrect

---

**6.** Quinn and his codefendant, Taylor, were convicted of aiding and abetting each other in the possession of cocaine, with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The essential elements in a violation of 21 U.S.C. § 841(a)(1) are "for any person knowingly or intentionally to ... possess with intent to ... distribute ... a controlled substance." *See, e.g., United States v. Evans*, 883

F.2d 496, 501 (6th Cir.1989) (citations omitted). "To be found guilty of the crime of aiding and abetting a criminal venture, a defendant must associate himself with the venture in a manner whereby he participates in it as something that he wishes to bring about and seeks by his acts to make succeed." *See Evans*, 883 F.2d at 501 (quoting, *inter alia, United States v. Knox*, 839 F.2d 285, 294 (6th Cir.1988)).

receipt or rejection of evidence." 437 U.S., at 14–16, 98 S.Ct., at 2148–2150. While the former is in effect a finding "that the government has failed to prove its case" against the defendant," the latter "implies nothing with respect to the guilt or innocence of the defendant," but is simply "a determination that [he] has been convicted through a judicial *process* which is defective in some fundamental respect." *Id.*, at 15, 98 S.Ct., at 2149 (emphasis added). [*Lockhart,* 109 S.Ct. at 290.]

The logic employed by the Chief Justice in *Lockhart* was foreshadowed by that which had earlier been succinctly expressed by the Ninth Circuit in *United States v. Harmon,* 632 F.2d 812 (9th Cir.1980) (per curiam):

Reversal for evidentiary insufficiency constitutes a decision that the government failed to prove the guilt of the accused. Reversal for failure to suppress evidence involves only a determination that the trial process was defective in a material respect, and implies nothing as to the sufficiency of the evidence of guilt of the defendant. The untainted evidence introduced by the government does not necessarily reflect all other available evidence of the defendant's involvement. It is impossible to know what additional evidence the government might have produced had the faulty evidence been excluded at trial, or what theory the government might have pursued had the evidence before the jury been different.... It would prolong trials unduly to adopt a rule that would require the government to introduce all available evidence and assert every possible legal theory in anticipation of reversal of trial court rulings admitting evidence....

*Harmon,* 632 F.2d at 814 (citations omitted). Consistent with *Lockhart,* therefore, we may consider Braxton's testimony in reviewing the sufficiency of the evidence.

The Supreme Court in *Lockhart,* however, was careful to emphasize at the outset that "[n]othing in the record suggests any misconduct in the prosecutor's submission of the evidence." 109 S.Ct. at 287.

As we have already observed, the prosecutor here was tardy in seeking the service of the subpoena and the actual effort was, in our judgment, unenthusiastic. Some form of blame will almost invariably accompany any claim of error and would seem rather obviously to be shown by the record here. We do not, however, conceive that this is sufficient in itself to amount to the kind of misconduct to which the Supreme Court refers in *Lockhart.* It would also seem that the trial court's decision to admit the evidence, though erroneous, as we have held, negatives any conclusion on its part that there was misconduct by or attributable to the prosecution.

■ We are therefore left with determining whether the evidence ruled inadmissible, with that which was properly presented before the jury, was sufficient under *Jackson v. Virginia, supra.* Viewing the evidence in the light most favorable to the prosecution, we must conclude that it was. It is evident that if Braxton had actually testified in person at the trial to the same circumstances as were admitted through her deposition testimony, a sufficient case would have been made out. It is not challenged that cocaine was found in the athletic bag within the apartment. Braxton's testimony, if believed by the jury, not only would have placed Quinn in Taylor's apartment, but would have identified him as the one who had brought the bag into the apartment. While not perhaps obliged to, the jury might have inferred and thus found beyond a reasonable doubt that Quinn had brought the athletic bag into the apartment and that he knew it contained a large amount of cocaine. Further reinforcing that proof, of course, is the proof of Quinn's unsuccessful flight from the scene, which would corroborate both his possession of the bag and his knowledge that it contained the large quantity of cocaine at the time of his possession. Therefore, we cannot conclude that upon the "evidence adduced at the trial *no rational trier of fact* would have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. at 324, 99 S.Ct. at 2792 (citation

omitted). Consistent with *Lockhart* and *Burks, supra,* Quinn may be retried.

## IV.

■ We address one final argument raised by Quinn on appeal. Quinn argues that the comments by the trial judge concerning the lack of "fingerprint evidence" distorted the defendant's argument and added to the testimony before the jury. During closing argument, Quinn's counsel stated that "the best corroboration that the Memphis Police Department could have brought in here were Mr. Quinn's fingerprints on that property they seized there. I submit to you, Mr. Quinn's fingerprints were not found on any item that was brought in this courtroom." Counsel mentioned the lack of fingerprints four more times during his closing argument. Taylor's counsel also argued that the Government did not produce testimony indicating that there were fingerprints.

During the prosecution's closing argument, the following discussion occurred, apparently within the hearing of the jury:[7]

[PROSECUTION:] ... The fingerprints, I don't know why they didn't try to find fingerprints. I can't say anything like that. I know that when you go for fingerprints, the way they do it is—

[QUINN'S COUNSEL:] I object. He's testifying if he tells—

[PROSECUTION:] I'm responding to their argument about fingerprints, Your Honor.

[QUINN'S COUNSEL:] All we said was there weren't any.

[THE COURT:] This is always a problem when the attorneys bring that fingerprint issue in, because there are not always fingerprints on something, and it takes an expert to explain why you can't have fingerprints, and it's just as wrong for defense attorney to assert to the jury that the Government didn't offer fingerprints when any expert will come in here and say that there aren't any fingerprints. My advice, under the circumstances, is to just advise the jury that

you were unable to make any finding one way or the other, because there were no fingerprints, because there was no fingerprint testimony.

You may not infer that that is any evidence of the defendant, not having handled them. But you also may not make any inference about fingerprints because the Government attorney has responded to this.

The district court did not exceed the boundaries of fair comment, particularly since there was no fingerprint testimony or other proof establishing whether such evidence could or could not have been obtained. *See Quercia v. United States,* 289 U.S. 466, 470, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933) (although the trial judge may not add to the evidence, mislead or express opinions that are "one-sided," it is within the province of the trial judge to explain and comment upon the evidence).

Accordingly, the judgment of the district court is REVERSED and the cause REMANDED for a new trial.

---

**7.** The transcript does not indicate that any of    this discussion was held at the bench.