974 F.2d 1339
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Anthony L. DEAN, Defendant-Appellant.
 Nos. 91-6209, 91-6250.
 United States Court of Appeals, Sixth Circuit.
 Aug. 27, 1992.
 
 Before NATHANIEL R. JONES and RALPH B. GUY, Jr., Circuit Judges, and JOINER, Senior District Judge.*
 PER CURIAM.
 
 
 1
 Defendant, Anthony L. Dean, appeals his jury conviction for possession with intent to distribute cocaine base and use of a firearm during a drug-trafficking offense. We find that all the errors that Dean alleges in this appeal constitute grounds for reversing his conviction.
 
 
 2
 * All of the testifying witnesses agree that the events at issue took place on March 6, 1991, at approximately 1:30 a.m. Many of the rest of the facts of this case are disputed. Dean testified that he was driving down Norris Road in Memphis, Tennessee when he saw two friends, J.T. Davis and Marvin Hammond, walking together. Dean parked his car and joined them as they walked into a fenced schoolyard to talk. Randy Davis, J.T.'s brother, joined them shortly thereafter, entering the schoolyard from the back.
 
 
 3
 Randy Davis testified initially that he had not seen anyone touching a gun or drugs, but upon further questioning, he stated that, when he first walked up to the group in the schoolyard, Marvin Hammond had a gun in his hand. Hammond stated that the weapon was for his protection. Davis testified further that he did not know, however, to whom the gun really belonged, and that he told police officers, later on the night in question, that he did not know anything about the gun or the drugs.
 
 
 4
 J.T. Davis testified initially that he had "not really" seen Hammond with a gun or drugs. J.A. at 95. Upon further questioning, however, he also stated that he had seen Hammond with the gun, as well as the drugs. He and Hammond had gone to the store together earlier to get some beer, he testified, and on the way, Hammond had stopped by the schoolyard and placed the gun and the drugs under one of the painted tires that are planted in the yard for the students' use. After their trip to the store, they returned to the playground, at which time Dean showed up, followed shortly by Randy Davis. His testimony conflicted with his brother's in that he did not recall Hammond retrieving the gun at any time after it was placed under the tire; although Randy claimed to have seen the gun in Hammond's hands, under J.T.'s version of the events, Hammond would not have been holding the gun at any time that Randy was present. J.T. further testified that he also told police officers later that night that he knew nothing about the guns or drugs.
 
 
 5
 Hammond's testimony supported that of both J.T. and Randy Davis to the extent that he was with the two of them and Dean in the schoolyard drinking beer. His testimony did not directly conflict with theirs in any way.
 
 
 6
 Officer Scott Reed of the Memphis Police Department was working undercover in the area of the schoolyard that night. Reed testified that as he drove past the four men at about 1:30 a.m., he heard someone yell "Yo, Bro!" at him. Id. at 36. He was driving only about five miles per hour, so as he looked to his left into the schoolyard he was able to observe an individual in a black-and-white warm-up suit waving at him. That individual was later identified as Dean. Reed drove on, but stopped a short distance away and radioed to have a uniformed officer come and investigate the situation. He then drove back closer to where Dean and the others were standing, parked so that his headlights were shining in their direction, and observed them through binoculars.
 
 
 7
 Reed testified that they were merely standing around talking at first, but that when the marked police car appeared, Dean reached down and pulled what seemed like a gun from his pants. He then walked over to one of the painted tires, a blue one, and placed the gun underneath it. The back-up police officers, Officers Bolden and Peters, drove up to where Reed was parked, at which point he showed them the individuals he wanted investigated. The back-up officers asked the four to stand up against the fence so they could be searched. The men complied, and Reed, Bolden, and Peters went into the schoolyard and searched them. At this point, Reed informed Peters that there was possibly a weapon hidden under one of the nearby tires. Peters searched and found a .22 caliber revolver under a blue tire, and later found a medicine bottle containing crack cocaine there also. Reed testified that the search turned up nothing else of significance, except that Dean was wearing a beeper.
 
 
 8
 The three officers were joined later by Officer Hulley, who assisted in completing the necessary paperwork, and Reed's lieutenant, who stopped in briefly because of the nature of the situation and signed the arrest tickets. Also, a field testing team stopped there just long enough to ascertain that the contents of the medicine bottle were, in fact, crack cocaine. Reed and the other officers arrested the four men. Reed read each his Miranda rights separately and asked each if he "wanted to talk." J.A. at 57. At this point he received the statements from Randy and J.T. Davis referred to previously. Reed also testified that Hammond told him at that time that the gun and drugs belonged to Dean.
 
 
 9
 Dean, to the contrary, testified that as he and his friends were talking in the schoolyard, Reed approached him and asked why Dean had been waving at him all night. He testified that the search and arrest process was much rougher and more violent than the officers' testimony would lead one to believe. He testified that Reed said, "Whoever got [sic] the most money out here, that's who gets the charge." J.A. at 109. He testified that he was not searched, but that the officers discovered his beeper when they picked him up from the ground. (His beeper, he claimed, allows his father to keep in touch with him, and had formerly been used in his now-defunct liquor store business.) He testified that he repeatedly asked the officers to fingerprint the gun. The gun was never fingerprinted, because the officers had handled it and any fingerprints would have been obliterated.
 
 
 10
 Reed denied saying that whichever person was found to have the most money would be charged with possession of the gun and drugs. Reed also denied that Dean asked him to fingerprint the gun or the bottle. Officer Peters denied hearing any officer state that whoever had the most money would get the charge. Officer Bolden also testified that he did not hear an officer make such a statement. Bolden denied hearing Dean ask the officers to fingerprint the gun, as well. The remainder of Peters's testimony and Bolden's testimony is also consistent with Reed's. Notably, as will become relevant later, Officer Peters also testified that the gun would hold ten bullets, but that it was loaded with only seven.
 
 
 11
 Following their arrests, the four men were transported to jail where they were kept in the same area until Hammond's removal. He again stated that the gun and drugs belonged to Dean. Following this statement, all were released except Dean, against whom Reed had decided to press charges. Reed testified that the others were released because of insufficient evidence.
 
 
 12
 A grand jury in the United States District Court for the Western District of Tennessee indicated Dean on March 8, 1991. The indictment charged him with possession with intent to distribute approximately 6.3 grams of cocaine base in violation of 21 U.S.C. § 841(a)(1) (1988) and of carrying and using a firearm during and in relation to a drug-trafficking crime in violation of 18 U.S.C.A. § 924(c) (West Supp.1992).
 
 
 13
 His trial commenced on June 5, 1991, and the jury verdict of guilty as to both counts of the indictment was returned on June 10. On June 17, Dean filed a motion for a judgment of acquittal or, alternatively, for a new trial. This motion was denied on July 24, 1991, and on August 16, a motion to reconsider was filed in the district court that also sought to supplement the record with evidence newly discovered since the trial ended. On August 27, 1991, that motion was denied.
 
 
 14
 On September 5, 1991, Dean's sentencing hearing was held. He was sentenced to sixty-three months' imprisonment as to the possession count and sixty months' imprisonment as to the firearm count, to be served consecutively. He was further sentenced to four years' supervised release. On September 9, 1991, Dean filed this timely appeal.
 
 II
 
 15
 Dean raises five issues in his appeal: (1) whether the district court erred in prohibiting defense counsel from pursuing a certain line of questioning; (2) whether the district court erred in its ruling regarding the absence of fingerprint evidence; (3) whether the district judge's comments at a side-bar conference prejudiced the defense; (4) whether the district court erred in denying Dean's motion for a new trial; and (5) whether the district court erred in allowing a courtroom spectator to testify about a gesture Dean allegedly made during the trial. We address each issue in turn.
 
 
 16
 * Dean's first charge of error concerns the district court's decision to exclude certain evidence. We review an evidentiary ruling first to determine whether the ruling was erroneous, and we then measure the effect of an erroneous ruling against the standard articulated in Rule 103. See Fed.R.Evid. 103. We will not find an error, however, in an area committed to the discretion of the district court--such as relevancy determinations made under Rule 401 or 402--unless the district court abused its discretion. The issue in this case involves the admission of prior inconsistent statements, which is a determination made under Rule 613(b) and is not committed to the discretion of the district court. See Fed.R.Evid. 613(b).
 
 
 17
 Dean wanted to pursue a line of questioning by which he hoped to prove that the officers did not know which of the four men to charge, and that they only charged Dean based on Hammond's statement, made at the police station the night of the arrests, which was to the effect that the gun and drugs belonged to Dean. Hammond testified at trial that he did not know to whom the items belonged and that he had never told the police that they belonged to Dean.
 
 
 18
 The main statement that Dean wanted the court to admit into evidence was one that Reed allegedly made to Dean: "[W]hy didn't you just tell me whose gun and drugs it was. I know it wasn't yours." J.A. at 115. The government argues that, by offering to testify to the statement himself, Dean was offering it as improper hearsay. The government submits that the proper course would have been for Dean to have asked Reed on cross-examination whether he made the statement; if Reed had responded in the negative, then Dean could have testified to the alleged remark as a prior inconsistent statement. At trial, the district court seemed to analyze the issue on the basis of the statement's relevancy. J.A. at 115-117. In its order denying Dean's motion for judgment of acquittal, however, the district court gave as its rationale the government's contention that "[t]his [statement] was not offered as a prior inconsistent statement of the officer, and it was inappropriate hearsay." Id. at 15.
 
 
 19
 We disagree. Dean's testimony is extrinsic evidence of Reed's alleged statement. The statement would certainly be inconsistent with Reed's testimony on direct examination, that he saw the person who was later identified as Dean pull a gun-like object out of his waistband and place it under the tire where a gun was later discovered. Thus, Dean's testimony was properly admissible under Rule 613(b) as extrinsic evidence of a prior inconsistent statement. The government's contention that Reed must have been questioned about the statement before Dean could testify to it is without merit. As the Federal Rules of Evidence advisory committee explains, the foundation requirement for admission of extrinsic evidence of prior inconsistent statements "is relaxed ... with no specification of any particular time or sequence," so long as Reed is afforded an opportunity to explain or deny his statement. Fed.R.Evid. 613(b) advisory committee's note. Accordingly, the district court erred in refusing to allow Dean to testify to the statement. Because, as will be seen, we find reversible error on other issues, we express no opinion as to whether this error, standing alone, would require reversal under the Rule 103 standard.
 
 B
 
 20
 The next issue Dean raises is that the district court abused its discretion in refusing to allow defense counsel the opportunity to comment on the absence of fingerprint evidence. Officer Peters, who recovered the gun and the medicine bottle from underneath the blue tire, testified that, contrary to proper police procedure, he did not bother to hold the items in such a way as to preserve them for fingerprinting. He and Officer Reed both testified that they never attempted to have the items fingerprinted. Agent Willard, a witness for the prosecution, testified that there would have been little use in dusting for fingerprints after the items had been handled as much as they had been by Peters. As noted previously, Dean testified that he repeatedly asked the officers to fingerprint the gun, but none of the officers remembers hearing such a request.
 
 
 21
 The issue arises here in the context of closing arguments. Dean's counsel wished to state in her closing argument that "no prints were found on the gun or drugs." J.A. at 136. The government objected to this statement, and the district court prohibited counsel from making it, on grounds that there was no proof to that effect. The following discussion took place between the court and counsel:
 
 
 22
 MS. SKAHAN: Officer Peters testified there was improper police procedure the way he grabbed the gun and the medicine bottle. Therefore no prints could be taken. I don't want to belabor the point.
 
 
 23
 THE COURT: Well, you can refer to the officer's testimony that--saying that none were found, but you can't say that--you can't argue that because none--that none were found because none was [sic] looked for. You can argue what the officer said. The officer said it, and that's a part of the record, but you must not argue that because ... the defendant demanded them this is evidence of his innocence. It just doesn't go that far.
 
 
 24
 MS. SKAHAN: I wasn't go [sic] to go that far.
 
 
 25
 ....
 
 
 26
 MR. CANALE: I would like the Court to clarify. The way I heard her say it she wants to argue that no prints were found. I don't believe any of the officers testified to that. They just said they didn't do it--
 
 
 27
 THE COURT: Now, wait a minute. Now, I've told her already not to do that, and she said she wasn't going to do that.
 
 
 28
 MS. SKAHAN: Your Honor, I'm not going to say he can't be found guilty because they don't have prints.
 
 
 29
 THE COURT: No, you can't say none were found. That's the way we started on this. You can't say that. You can refer to the officer's testimony that the officer--well, I don't know what he did say. He did say that fingerprints were not--one of them said fingerprints were not taken because they had been handled so much. Now, I don't know it might be if pursued it [sic], he made [sic] have said that's the only way we could get the pistol out of the tire was to pick it up.... But you may not argue that none were found. You didn't look for any.
 
 
 30
 Id. at 136-37 (emphasis added).
 
 
 31
 This circuit has recently decided two cases dealing with the issue of commentary on fingerprint evidence. In the first case, United States v. Quinn, 901 F.2d 522 (6th Cir.1990), which also involved a drug arrest, the defendant's counsel mentioned the lack of fingerprints on the drug materials five times in his closing argument. During the government's closing, the defendant objected to an argument of the prosecution concerning why no fingerprint evidence was offered in the case, which led the district court to make a statement about the probative value of the lack of such evidence. The district court found it problematic that defense attorneys argue this point,
 
 
 32
 because there are not always fingerprints on something, and it takes an expert to explain why you can't have fingerprints, and it's just as wrong for defense attorney to assert to the jury that the Government didn't offer fingerprints when any expert will come in here and say that there aren't any fingerprints.
 
 
 33
 Id. at 532. On appeal, this court held that "[t]he district court did not exceed the boundaries of fair comment, particularly since there was no fingerprint testimony or other proof establishing whether such evidence could or could not have been obtained." Id.
 
 
 34
 The following year, the second such appeal came before this court, in a context more like that of the case at bar. In United States v. Poindexter, 942 F.2d 354 (6th Cir.), cert. denied, 112 S.Ct. 615 (1991), two codefendants raised the issue of the district court's improper limitation upon closing argument; the district court again prohibited commentary by defense counsel on the lack of fingerprint evidence. In Poindexter, unlike Quinn, there had been police testimony that an effort had been made to fingerprint the can containing the drugs at issue in the case. Id. at 359. The government, however, never offered any evidence that the defendants' prints were found on the can. The first defendant's counsel, in his closing, referred to that testimony and asked: " 'Well, the next logical question that I pose to you, ladies and gentlemen of the jury is, whose fingerprints were found on that can?' " Id. The district court, following the government's objection to this rhetorical question, ruled that the question was improper. The court stated to the jury that fingerprint evidence can only be introduced and explained by an expert, and that the lack of it does not prove anything conclusively as to the defendant's innocence. The court further stated in a bench conference, but within hearing of the jury, that defense counsel was being unfair in that, even if there were no fingerprints on the item, it would not prove that the defendant did not handle it.
 
 
 35
 This court held on appeal that the district court had abused its discretion. The court distinguished Quinn on the grounds that no fingerprint testimony or other proof establishing whether such evidence could have been obtained was even in the record. Id. The Poindexter opinion went on to point out that the defendant's counsel had not argued that the lack of fingerprint evidence proved anything. "He wished to argue only that the government's failure to introduce its findings, if any, concerning the presence or absence of fingerprints on a can that had been dusted for fingerprints may raise a reasonable doubt as to whether [defendant] handled the can and, consequently, as to [his] guilt." Id. at 359-60 (emphasis added). The Poindexter court held that the inference defense counsel had attempted to make was a legitimate one.[1]
 
 
 36
 Upon reviewing the facts of the instant case, we find that Dean's counsel was likewise only trying to make a legitimate inference--the same one attempted in Poindexter. Dean's counsel stated clearly that she was not attempting to argue that the lack of fingerprint evidence proved Dean's innocence. J.A. at 137. The distinction that the district court has drawn is too fine. Dean's counsel could have legitimately argued that no fingerprints were found. That none were found because the items were not dusted for fingerprints does not change the fact that none were found, or make it unfair to argue the point. The officers are at fault for not preserving the items for fingerprints, whether or not Dean asked them to fingerprint them. Therefore, we distinguish Quinn on the same grounds as did the Poindexter court, and hold that the district court abused its discretion in prohibiting defense counsel's fingerprint argument, as it did in Poindexter. We reverse the district court's decision; to rule otherwise would provide a temptation, if not an incentive, for police officers not to fingerprint often.
 
 C
 
 37
 The third issue is whether the district court erred in verbally attacking defense counsel within hearing of the jury. Dean contends that the comments the district court made discredited his counsel in the jury's eyes, thereby prejudicing him. The complained-of exchange took place during a side-bar conference, but Dean alleges that the "outburst" was in hearing of the jury. Br. of Dean at 32 n. 2. This court has held that side-bar conferences in the jury's presence will be assumed to be within the hearing of the jury "unless the record shows otherwise." Poindexter, 942 F.2d at 360. Dean freely acknowledges that the court reporter noted after the conference had ended that, thereafter, the "proceedings were held in the hearing and presence of the jury." J.A. at 117. He argues that this is merely a routine notation after side-bar conferences--court-reporter boilerplate, as it were--and that it should not alone overcome the presumption that the jury was able to hear the district judge's criticizing Dean's counsel. In support of this argument, Dean points out that the court reporter, in the notation that the side-bar had begun, gave no indication that the jury had been sent from the room, but only that the "proceedings were held at the bench." Id. at 113. We believe that Dean is correct in arguing that the record does not conclusively show that the jury was unable to hear the challenged remarks.
 
 
 38
 Thus, we proceed to the merits of Dean's claim of prejudice. During the side-bar conference, the district court implied that Dean's counsel was incompetent ("I don't have time to ... teach you a basic course in criminal law."), ineffective ("[D]on't waste my time anymore."), and unethical ("I hope you don't try to do the things you do [in general sessions court] every day because we don't allow a lot of those things."). J.A. at 116-17. In Poindexter, this court found that similar comments made by the district court, implying that the attorney was unethical and unfair, were improper and not harmless. 942 F.2d at 360. A jury cannot help but be impacted in some fashion by such criticism directed from a judge toward an attorney appearing before him. In light of the similarities between the two cases, we find that the district court erred in the instant case as well.
 
 D
 
 39
 Dean charges the district court with error in that his motion for a new trial based on newly discovered evidence was wrongly denied. Such motions are disfavored, and a district court's determination that a new trial is not warranted will not be reversed absent " 'clear abuse of discretion.' " United States v. O'Dell, 805 F.2d 637, 640 (6th Cir.1986) (quoting United States v. Allen, 748 F.2d 334, 337 (6th Cir.1984) (per curiam)), cert. denied, 484 U.S. 859 (1987).
 
 
 40
 Dean must establish the following four elements before a new trial should be granted: (1) the new evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal. Id. (quoting United States v. Barlow, 693 F.2d 954, 966 (6th Cir.1982), cert. denied, 461 U.S. 945 (1983)). The government concedes that the first element is met, but contends that the remaining three elements are not. Although we believe the question is very close, after examining each of the three contested elements in turn, we conclude that Dean has satisfied all four elements of the test and, therefore, should have been granted a new trial.
 
 
 41
 Dean and his counsel both swore out affidavits to the effect that, after his conviction, Brenda Davis, Randy's and J.T.'s sister, approached them with exculpatory evidence concerning his charges. Although Dean states that he knew Brenda Davis all along, he was not aware that she had any first-hand knowledge that could help his case. Brenda Davis told Dean and his counsel that she was dating Hammond at the time of the events underlying this case and that she was with him approximately an hour before the arrests, and she swore out an affidavit to that effect. She stated that, on that evening, she gave Hammond the medicine bottle in which the drugs were later found; in fact, she claimed to have seen him place some rocks of cocaine in the bottle, several of which he gave to her before he left her home. When he left, she stated, he told her he was on his way to visit a friend whose house is across the street from the playground where the men were later arrested. Davis also swore that she and Randy were present on an occasion when a Frank Edwards pawned a gun to Hammond in exchange for cocaine.
 
 
 42
 Davis's affidavit led Dean to question Edwards, who also was willing to swear out an affidavit. Edwards stated that the above-mentioned transaction did occur between Hammond and himself; that he traded a .22 caliber long-barrelled pistol for $60 worth of cocaine rocks. He also swore that Brenda and Randy Davis were witnesses to the transaction.
 
 
 43
 In making our determination, given that the government concedes that the above evidence was discovered after the trial, we must first consider whether it could have been discovered earlier with due diligence. Dean argues that he knew nothing about Edwards or the gun transaction and that, although he knew Brenda, he was not aware that she had been dating Hammond or that she had any useful information to provide. Thus, it was only when she was willing to come forward that he could have possibly known about the evidence, which is a matter completely out of his control. Certainly, he argues, his counsel is not required to interview his every acquaintance to satisfy due diligence.
 
 
 44
 The district court stated that "it [was] plain that Brenda Davis was a known ex-girlfriend of Marvin Hammond and that she could have been sought out, questioned and subpoenaed before trial." J.A. at 16. The court does not support this statement with any reason why it was "plain," or to whom it was "known," that Davis and Hammond were dating; we assume that the court is referring to the likelihood that Davis's brothers knew this information.
 
 
 45
 We believe that it is clear on the record that the Davis brothers are at least as unwilling to see Hammond convicted for these crimes as they are to see Dean convicted, guilt or innocence notwithstanding. They both originally told the police that they did not know to whom the gun and drugs belonged. At trial, however, they were willing to state that they had seen Hammond with the items. We find that there was a distinct possibility that at trial they could still have been withholding crucial information, such as the fact that their sister might have exculpatory evidence. If Brenda was dating Hammond at the time of the arrests, she would not likely volunteer information against him. Therefore, we find that Dean's counsel was sufficiently diligent in attempting to discover evidence for the trial, and in so finding, we note that even due diligence is unlikely to uncover evidence that witnesses, known or unknown, refuse to reveal.
 
 
 46
 We next consider whether the evidence is material, and not merely cumulative or impeaching. This question is a much easier one. The government argues that, because J.T.'s and Randy's trial testimonies already placed the gun and drugs with Hammond, the new evidence is merely cumulative. We disagree. The Davises' testimonies established only that Hammond had been seen with the gun and the drugs; Brenda's and Edwards' affidavits establish how and when he obtained the items, and that they were his. As such, the affidavits constitute material evidence of a type that was not previously a part of the record. Thus, Dean satisfies the third element.
 
 
 47
 Finally, we consider whether the new evidence would likely produce an acquittal and determine that indeed it would. The main piece of evidence against Dean is Reed's testimony that he saw Dean take something long out of his waistband and place it under the tire. Besides this statement, and Hammond's alleged statement on the night of the arrests that the gun and drugs were Dean's, no more evidence exists against Dean than against J.T. or Randy, who also happened to be in the schoolyard that night. On the other hand, considering all the evidence from trial along with the new evidence, a great deal of testimony links the items with Hammond. Once again, Hammond was not willing to testify that the items belonged to Dean and he further denied that he ever said they did. A jury able to consider all of the evidence, including that discovered after the original trial, might easily find that Dean was not guilty. We find, therefore, that the fourth and final element is met, and that Dean should be granted a new trial.
 
 E
 
 48
 The final issue Dean raises on appeal is whether the district court erred in admitting certain testimony in rebuttal of his testimony. As alluded to above, Officer Peters testified that the gun he found had ten cylinders. Immediately after he made that statement, an onlooker at the trial, Sid Woodard, allegedly observed Dean putting up nine fingers while "smirking" and looking pointedly at some of his friends in the audience. During a brief recess following Peters's testimony, Woodard told the prosecutor what he had allegedly seen and indicated his willingness to testify to it. The prosecutor, after checking the weapon and discovering that it indeed contained only nine cylinders, asked the court's permission for Woodard to testify. The court, after some discussion, refused to allow Woodard to testify, either as a direct witness or in rebuttal. Two days later, however, when Dean took the stand and testified that he did not know anything about the gun, the district court changed its mind and allowed the prosecution to bring Woodard to the stand. Dean argues that this ruling was both improper and prejudicial. He contends that by allowing a courtroom spectator to testify as to his behavior, the court usurped the role of the jury as the determiner of witness credibility. Moreover, he argues that, in this particular case, by the district court initially stating that the testimony would not be allowed, and then later deciding to allow it after all, Dean was prejudiced in that (1) he had already waived his Fifth Amendment right not to testify and (2) he was precluded from interviewing other spectators who were in the courtroom the day he allegedly made the gesture.
 
 
 49
 Because we have already determined that Dean must be retried, we decline to decide this unusual question. We simply note that the original trial was basically unfair to Dean; the prejudicial errors we found permeated the entire proceeding. In this context, while we do not decide whether the spectator testimony should have been ultimately allowed, we believe that any prejudice that Dean might have suffered as a result of the district court's changing its ruling and admitting the testimony adds to the cumulative prejudicial effect of the other errors, and merely serves to bolster our decision to grant Dean a new trial.
 
 III
 
 50
 Accordingly, with the exception of the district court's ruling that the line of questioning that Dean wished to pursue was irrelevant and inadmissible, we REVERSE the district court's judgment of conviction and REMAND the case for further proceedings consistent with this opinion.
 
 
 51
 RALPH B. GUY, JR., concurring.
 
 
 52
 Although I agree with the results reached in this case, I write separately to express my concern regarding our continued reference to the limited presumption that juries overhear sidebar conferences, articulated in United States v. Poindexter, 942 F.2d 354, 360 (6th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 615 (1991), modified sub nom. United States v. Day, 956 F.2d 124 (6th Cir.1992), invoked in Part II-C of the court's opinion.
 
 
 53
 On rehearing in Day, the government argued that there was no logic in assuming that sidebars do not work as intended. Two panel members disagreed but withdrew the assumption as to Day because the presiding judge had discovered that the record did, in fact, state that the sidebar was outside the jury's hearing. Id. at 125 (stating, "we withdraw our holding ... in this case"). Judge Kennedy wrote separately because she "believed [the panel] erred in [its] earlier holding, since withdrawn, that we would presume the jury overheard a sidebar conference in the absence of evidence to the contrary." Id. at 125 (emphasis added).
 
 
 54
 It appears that the panel members disagreed regarding what holding they were withdrawing. The majority of the panel apparently thought that it withdrew its holding that Day's jury had overheard the prejudicial sidebar. Judge Kennedy maintained, however, that the court's decision retracted the presumption that juries hear sidebars unless the record shows otherwise.
 
 
 55
 If that were the only shadow over Poindexter, we might simply defer to the majority's interpretation and apply it here. Judge Kennedy wrote persuasively, however, that the Poindexter presumption was ill conceived as well as rejected by an earlier panel. See United States v. Smith, 928 F.2d 740 (6th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 159 (1991).
 
 
 56
 In Smith, the trial judge had criticized defense counsel first in the jury's presence and subsequently at a sidebar conference. As Judge Kennedy noted, the Smith court stated:
 
 
 57
 [T]o the extent the trial judge's comments were otherwise objectionable, they were made in the main at the sidebar and therefore out of hearing of the jury. By the court reporter's characterization of the event, we have no reason to believe that the statements which occurred at the sidebar were actually heard by the jury and therefore its verdict could only have been improperly influenced, if at all, by the relatively brief colloquy which occurred in its presence.... [T]he comments of the trial judge actually made in the presence of the jury did not rise to that element of reversible error, especially since the record seems to have been singularly free of similar incidents elsewhere in the course of trial.
 
 
 58
 What defense counsel would have us believe, however, is that the statements made by the trial judge at the sidebar conference were not only improper but were also, to his client's prejudice, heard by the jury. In that presumption we may not indulge.
 
 
 59
 Day, 956 F.2d at 125 (quoting Smith, 928 F.2d at 742-43) (emphasis added).
 
 
 60
 The Smith court, after acknowledging the inherent imperfections in the written record of criminal trials, expressed its conviction that the jury's verdict was unaffected by the judge's comments made at sidebar, i.e., that any error was harmless. Smith, 928 F.2d at 743. Thus, the underscored language above is arguably dictum, not binding upon subsequent panels. Judge Kennedy's reliance upon Smith, however, buttresses her argument that others, including the Eleventh and First Circuits, would reject this aspect of Poindexter. See Day, 928 F.2d at 125 (citing United States v. Block, 755 F.2d 770 (11th Cir.1985) (requiring complaining party to establish that disparaging remarks by the trial judge were heard by the jury); Harris v. United States, 367 F.2d 633, 636 (1st Cir.1966) (same), cert. denied, 386 U.S. 915 (1967)).
 
 Judge Kennedy cogently wrote:
 
 61
 [I]f you presume error, although there has been neither a contemporaneous objection nor a motion for mistrial, the party who does not claim the remarks were overheard is required to ask for a voir dire inquiry to establish that the sidebar conference was not heard by the jury. That party may not even know that the opposing party claims the comments were overheard until the issue is raised on appeal. The only certain way to avoid the problem will be to excuse the jury in every instance in which a sidebar conference is needed. Requiring that the jury be removed every time a judge makes a sidebar ruling that the jury should not hear seems to me unwarranted. The jury will be more prejudiced by being excused and speculating what happened in its absence than observing a quiet remark to counsel at the sidebar.
 
 
 62
 Day, 956 F.2d at 126.
 
 
 63
 I recognize that I am writing on a point not central to our decision, but since it is not clear, to me at least, that the "Poindexter rule" is even binding on this panel, I am reluctant to further entrench it in our jurisprudence by citing to it without comment.
 
 
 
 *
 Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The government notes that, in Poindexter, this court only reversed based on this issue as to one of the two defendants, on the ground that the error in this context was harmless as to the other defendant. The court found that the overall case against the first defendant was not strong, and so the error may well have been harmful. The government had much stronger evidence against the second defendant, thus the court felt that in his case it was harmless error, and not reversible. The government would have us determine that Dean is more like the latter than the former. We disagree; as we point out in Part II.D and Part III, in a trial conducted without the errors found in this opinion, Dean might well be acquitted