991 F.2d 797
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Nick LOPEZ and Arthur Hinojosa, Defendants-Appellants.
 Nos. 91-2426, 92-1192.
 United States Court of Appeals, Sixth Circuit.
 April 2, 1993.
 
 Before JONES and GUY, Circuit Judges, and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant-Appellant Nick Lopez appeals his sentence and Defendant-Appellant Arthur Hinojosa appeals his conviction in this narcotics and firearms case. For the reasons stated herein, we affirm.
 
 I.
 
 2
 Lopez and Hinojosa were indicted by a federal grand jury on March 27, 1991. They, along with co-defendants Severiano Lopez (Sam Lopez) and Reynaldo Maldonado, were charged with conspiring with each other to possess with the intent to distribute and to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 846 (1988). Lopez and Maldonado were also charged with the distribution of marijuana and aiding and abetting each other in the distribution of marijuana, in contravention of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (1988). Hinojosa and Sam Lopez were charged with possessing with the intent to distribute marijuana and aiding and abetting each other in possessing with the intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.
 
 
 3
 Sam Lopez and Maldonado pled guilty. Lopez and Hinojosa pled not guilty and were tried.
 
 
 4
 The evidence presented by the government at trial showed the following:
 
 
 5
 Officer Andrew Quaal was introduced to Maldonado by an informant on March 5, 1991 at a McDonald's restaurant. Thereafter, the Bay Area Narcotics Enforcement Team (BAYANET) made a series of undercover purchases from Maldonado on March 5, 6, and 13, 1991 at various McDonald's restaurants in Saginaw, Michigan.
 
 
 6
 During a telephone conversation on March 19, 1991, Maldonado told Quaal that he could sell ten pounds of marijuana that night to him. Quaal indicated that he would not have the money for that amount of marijuana until the following day, but that he could purchase another ounce on March 19. Maldonado indicated that his "man" would drop him off at the designated McDonald's. Accompanied by Officer John Aten, Quaal pulled into the restaurant parking lot later that day and parked next to a gold and brown Chevrolet Monza with Lopez in the driver's seat. The car was registered to Lopez's father, Severiano (Sam) Lopez. Once the officers were inside the McDonald's, Maldonado delivered the ounce of marijuana and received $175 from the officers. They also discussed a larger purchase for $1350 per pound.
 
 
 7
 Subsequently, Maldonado agreed to sell two pounds to the officers during a meeting at a McDonald's restaurant on March 20, 1991. When Quaal arrived at the restaurant parking lot, Maldonado was sitting in the same Monza Quaal saw the day before. Lopez was inside the restaurant. Quaal paid Maldonado $2800 and received a bag containing two pounds of marijuana. Both Maldonado and Lopez were arrested immediately. At that time, Lopez stated that he lived at 3000 Yauck in Saginaw and gave the phone number for that address. He also stated that the marijuana came from Ft. Worth, Texas.
 
 
 8
 At about the same time of the arrests of Maldonado and Lopez on March 20, a search warrant was executed by other officers at 3000 Yauck. Two firearms were seized in a northeast bedroom. First, a nine millimeter Ruger with a loaded clip was discovered in a dresser drawer. A loaded nine millimeter magazine was found in a nightstand drawer. Second, a .32 semiautomatic with a full magazine was discovered in a dresser drawer. Sam Lopez later claimed ownership of the guns and possession of the bedroom.
 
 
 9
 A brown leather bag containing $6500 was seized from the closet in the northeast bedroom. A red suitcase containing clothes belonging to Hinojosa was also seized from that bedroom. Hinojosa confirmed that the suitcase and clothing belonged to his girlfriend and himself and that they were staying in this bedroom.
 
 
 10
 Marijuana was seized from several locations. Four one-pound quantities of marijuana were discovered in a blue suitcase in a Dutchman Travel Trailer parked near the garage. Located in the trailer was a red suitcase almost identical to Hinojosa's, only larger, which contained twenty one-pound quantities of marijuana in plastic bags. An additional twenty pounds of marijuana were found under the trailer. A paper bag containing marijuana, seeds, plastic bags similar to those found containing marijuana, and a triple-beam balance scale were all found in the garage.
 
 
 11
 Taken from Hinojosa were a cigarette package containing one marijuana cigarette, as well as his driver's license which indicated that he was from Ft. Worth, Texas. Hinojosa, who was present when the search of 3000 Yauck was initiated, told officers that he had driven to Saginaw from his home in Ft. Worth the previous Wednesday, March 13, in his girlfriend Janie Salas' 1991 Chevrolet Blazer. He identified the red suitcase seized from the northeast bedroom as theirs. He also indicated that he smoked marijuana twice a week.
 
 
 12
 Seized from the Chevrolet Blazer was one marijuana seed, a certificate of insurance for the vehicle in the name of Hinojosa, motel bills from Ft. Worth and San Antonio, Texas charged to Hinojosa, and a certificate of title for the 1990 Dutchman Travel Trailer where marijuana was found. The trailer was registered to Francisco Torrez, a former common law husband of Salas.
 
 
 13
 At the close of the government's case in chief, Hinojosa moved for a judgment of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The district court denied that motion. Both Defendants then put on evidence.
 
 
 14
 Salas, testifying for Hinojosa, stated that she was presently the common law wife of Hinojosa, that they lived in Ft. Worth, and that they had arrived in Saginaw on March 18, 1991. She identified the smaller red suitcase as belonging to her, but denied owning the other larger red suitcase containing the marijuana.[1] Salas testified that they had not transported marijuana from Ft. Worth to Saginaw and that they were staying in the living room, not the bedroom where the guns, money and their suitcase were discovered.
 
 
 15
 Benita Estrada testified for Lopez. She stated that he resided at 3133 Lowell with her, but he used 3000 Yauck as his address because she received Aid to Dependent Children (ADC) benefits and ADC regulations prohibited Lopez from living with her. In addition to Estrada's testimony, there was evidence which indicated that Lopez had no personal belongings at 3000 Yauck.
 
 
 16
 During rebuttal, Augustine Sanchez testified that he went with a friend to 3000 Yauck during March 1991 to purchase marijuana. They waited for someone to arrive. Finally, Lopez arrived and he gave his father, Sam Lopez, a brown bag. The three then went to the garage where Sam Lopez took out two pounds of marijuana for Sanchez.
 
 
 17
 Hinojosa did not renew his motion for a judgment of acquittal at the close of his evidence nor at the close of all of the evidence.
 
 
 18
 Lopez and Hinojosa were convicted as charged. Lopez was sentenced on December 9, 1991. Pursuant to the United States Sentencing Commission's Guidelines Manual (1991) [hereinafter U.S.S.G.], Lopez's base offense level was determined to be eighteen. He was given a two-level enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of a dangerous weapon. As a result of his offense level and criminal history, Lopez was sentenced to forty-eight months in prison and three years supervised release. Hinojosa was sentenced on January 31, 1992 to thirty-three months in prison, three years supervised release, and a fine of $6000.
 
 II.
 
 19
 Lopez contends that the district court erred in finding that there were sufficient facts to support an enhancement pursuant to U.S.S.G. § 2D1.1(b)(1). Section 2D1.1(b)(1) provides for the addition of two levels to the base offense level for drug trafficking for possession of a dangerous weapon.
 
 
 20
 Paragraph three of the commentary to this section provides, in pertinent part:
 
 
 21
 The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.
 
 
 22
 U.S.S.G. § 2D1.1, comment. (n. 3).
 
 
 23
 A defendant's sentence can be enhanced under Section 2D1.1(b)(1) even where the weapon was possessed by a co-conspirator as long as it was reasonably foreseeable to that defendant that the weapon would be possessed by another member of the conspiracy. See United States v. Christian, 942 F.2d 363, 368 (6th Cir.1991), cert. denied, 112 S.Ct. 905 (1992); United States v. Sanchez, 928 F.2d 1450, 1459 (6th Cir.1991).
 
 
 24
 The district court's finding by a preponderance of the evidence that the facts support the application of U.S.S.G. § 2D1.1(b), so as to enhance a defendant's sentence, is to be upheld unless that finding is clearly erroneous. United States v. Duncan, 918 F.2d 647, 650 (6th Cir.1990), cert. denied, 111 S.Ct. 2055 (1991).
 
 
 25
 Lopez states two reasons why he contends that the district court's finding was clear error. First, Lopez argues that the district court erred by holding that he lived in his father's house at 3000 Yauck. Second, he contends that he did not have possession of the guns and should not be held accountable for the guns because it was not reasonably foreseeable to him that the weapons were possessed by another member of the conspiracy.
 
 
 26
 Lopez's first argument is, at best, weak. Although none of Lopez's clothes or personal belongings were found at 3000 Yauck, Lopez personally admitted to the police officers when he was first arrested that he lived at 3000 Yauck. Furthermore, he was seen by Sanchez, a marijuana purchaser, and others at that house. Lopez's first argument is irrelevant, however, because we find that the district court did not clearly err in holding that it was reasonably foreseeable to Lopez that the weapons were possessed by another member of the conspiracy.[2] As a result, the weapons were attributable to Lopez.
 
 
 27
 Several facts highlight this foreseeability, including the facts that: marijuana was located at various parts of the house, including the garage and a trailer parked nearby; Sanchez established that at least one marijuana buy took place at 3000 Yauck with Lopez and Sam Lopez present; Hinojosa, as a member of the conspiracy, had ready access to the weapons because he actually resided in the same room where the guns were kept; Sam Lopez had access to the guns based on him claiming possession to the guns and the room; and the guns were located in the same room that the $6500 in currency was found.
 
 
 28
 Finally, based on the facts detailed above, we find that it was not clearly improbable that the weapons were connected to the offense. See United States v. Snyder, 913 F.2d 300, 303-304 (6th Cir.1990), cert. denied, 111 S.Ct. 709 (1991). In Snyder, execution of a search warrant produced a quantity of cocaine, currency, two scales, and two handguns. The guns were found in the defendant's bedroom nightstand, allegedly were not used during the offense, and were located in a different part of the house than the drugs, which were seized in the basement. Nonetheless, this court held that because the guns could have facilitated the defendant's illegal cocaine transactions, Section 2D1.1(b)(1) was satisfied. Id. See also United States v. Schaper, 903 F.2d 891, 895-96 (2d Cir.1990) (Section 2D1.1 held applicable to a defendant where gun was located in the master bedroom and cocaine was found in garage, records of narcotics transactions were found in house, and house phone was used to arrange cocaine deals).
 
 
 29
 Based on the foregoing, the district court's application of Section 2D1.1(b)(1) is supported by the facts and is not clearly erroneous.
 
 III.
 
 30
 Hinojosa moved for judgment of acquittal at the close of the government's case-in-chief. He argued, as he does in this appeal, that the evidence was insufficient to prove the elements of the crimes which he was charged with committing. Hinojosa contended that the evidence which linked him to the marijuana and/or the conspiracy was, at best, equivocal. He stated, as he does now, that the evidence which arguably linked him to the drugs and/or the conspiracy was limited to: 1) the almost identical red suitcases; 2) his presence at 3000 Yauck at the time of the search and seizure; 3) his admission that he was staying in the bedroom where the guns and $6500 were located; 4) 3000 Yauck being a marijuana site; and 5) a seed that the district court found to be a marijuana seed located in the Chevrolet Blazer of which he was a passenger. The trial court denied the motion. Thereafter, both Defendants put on evidence. After the Defendants rested, the government put on rebuttal evidence. Hinojosa did not renew his motion at the close of his evidence or at the close of the government's rebuttal evidence.
 
 
 31
 When a defendant moves for judgment of acquittal at the close of the government's case-in-chief, but fails to renew his/her motion for acquittal at the close of all of the evidence, this Court will not review the district court's denial of a motion for acquittal absent a showing of a manifest miscarriage of justice. United States v. Williams, 940 F.2d 176, 180 (6th Cir.) (citing United States v. Faymore, 736 F.2d 328, 334 (6th Cir.), cert. denied, 469 U.S. 868 (1984)), cert. denied, 112 S.Ct. 666 (1991).
 
 
 32
 When a defendant has appropriately preserved his/her Rule 29 motion, the court of appeals must review " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Quinn, 901 F.2d 522, 529 (6th Cir.1990) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1978) (emphasis in original)). The method of review is to "view the evidence and all reasonable inferences therefrom in the light most favorable to the government." United States v. Reed, 821 F.2d 322, 325 (6th Cir.1987).
 
 
 33
 We find that, even had the defendant not procedurally defaulted, the evidence and all reasonable inferences therefrom, if put in a light most favorable to the government, could show the following:
 
 
 34
 Maldonado told agents in early March 1991 that he was expecting a shipment of 30 to 40 pounds. The agents expected the marijuana to come from either Florida or Texas. On March 13, 1991, Maldonado told Officer Quaal that he could get any amount desired from Maldonado's source in San Antonio. On March 19, 1991, Maldonado had apparently received a quantity of marijuana because he was prepared to sell the agents 10 pounds. This date coincides with the arrival from Texas of Hinojosa and his girlfriend, Salas, who said they had arrived on the 18th.
 
 
 35
 Hinojosa was present at 3000 Yauck where marijuana, firearms and money were found in various locations throughout the house, trailer and garage. His suitcase and clothing were found in the bedroom where the guns and the $6500 in cash were located and where he admitted staying. Several incriminating items were seized from the Chevrolet Blazer which Hinojosa and Salas had ridden from Ft. Worth, including a marijuana seed, motel bills from San Antonio and Ft. Worth, a certificate of insurance for the vehicle placed in the name of Hinojosa, and the certificate of title for the Dutchman Travel Trailer, where numerous one-pound packages of marijuana were found.
 
 
 36
 Hinojosa indicated he used marijuana twice a week and was found in possession of one marijuana cigarette at the time he was arrested. In addition, he admitted to possessing a red suitcase which appeared to be part of a matched set which included a larger red suitcase in the trailer. That larger suitcase contained twenty one-pound plastic bags of marijuana.
 
 
 37
 We find that these circumstances are more than sufficient to support the conclusion that Hinojosa was involved in the conspiracy to distribute marijuana. A fortiori, we find that there was not a manifest miscarriage of justice in the district court's denial of Hinojosa's Rule 29 motion.
 
 IV.
 
 38
 For the reasons stated, the sentence of Lopez and the conviction of Hinojosa are affirmed.
 
 
 
 [1]
 In ruling on Hinojosa's Rule 29 motion, the district court noted that the two suitcases were almost identical and appeared to be part of a matched set
 
 
 [2]
 The district court actually stated that it thought Lopez knew that the "firearm was around, one of a variety of places where drugs were stored: the garage, in the house, bedroom, couple of bedrooms and so on." J.A. at 408-9