*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0036p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

QUINN HAMILTON,

     *Petitioner-Appellant,*

    *v.*

JACK MORGAN, Warden,

     *Respondent-Appellee.*

No. 05-5614

>

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 03-00275—William J. Haynes, Jr., District Judge.

Argued: January 26, 2006

Decided and Filed: January 24, 2007

Before: SILER, BATCHELDER, and MOORE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Michael C. Holley, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. David H. Findley, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Michael C. Holley, R. David Baker, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. David H. Findley, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

    SILER, J., delivered the opinion of the court, in which BATCHELDER, J., joined. MOORE, J. (pp. 8-14), delivered a separate dissenting opinion.

---

## OPINION

---

    SILER, Circuit Judge. Petitioner Quinn Hamilton appeals the district court's grant of summary judgment in favor of Respondent Warden Jack Morgan (hereinafter "the State") on his habeas corpus petition, pursuant to 28 U.S.C. § 2254, seeking relief from a state court conviction for armed robbery and evading arrest. Because the decision of the Tennessee courts to allow prior testimony of a witness deemed unavailable for trial was neither "contrary to" nor "an unreasonable application of" federal law, we affirm the denial of Hamilton's writ.

1

# I. Background

In February 1997, Quan Shelton reported to Nashville police that two men robbed him of a gold necklace and $550 in cash. Detective Shellie Malone, investigating the crime, met with Shelton and took descriptions of the alleged perpetrators. Using those descriptions, she generated from a police database photographs of black males. Shelton failed to identify the older suspect but identified juvenile Mario Woodard.

Police subsequently arrested Woodard, who agreed to cooperate. He identified Quinn Hamilton as the other suspect. Based on that information, Detective Malone again met with Shelton and showed him a photographic line-up of six men, which included a photograph of Hamilton. Shelton "immediately" identified Hamilton.

At Hamilton's preliminary hearing, Shelton testified that he was walking down the street alone when two men accosted him. He stated that a younger man was on a bicycle, but that an older man approached him, put a gun to his stomach, and removed his gold necklace. The older man then reached into Shelton's pockets, demanded money, and threatened to kill Shelton. Shelton had $550 in cash, which the older man took. Shelton identified Hamilton as the older man, and Woodard as the younger. He also stated that he had joined the armed services and would be reporting for basic training in August 1997.

Later, at a suppression hearing, Shelton testified that, from a photographic lineup, he identified Hamilton as the man who robbed him and that Detective Malone did nothing to indicate Hamilton's photograph as the man who robbed him. He further identified Hamilton in the courtroom. Hamilton's attorney was present at both hearings and cross-examined Shelton.

In January 2000, a few days before Hamilton's first trial date, the State filed a motion seeking to declare Shelton unavailable and requesting the court to allow his prior testimony to be admitted at trial. In support of its motion, the State filed a letter dated January 6, 2000, from Captain Elizabeth W. Watson, Shelton's company commander. The letter stated that Shelton was at that time stationed in Germany, but had twice been AWOL. For that reason, Captain Watson declined to support his attendance at Hamilton's trial. In response to the State's motion, the trial court ordered a transcript of Shelton's suppression hearing testimony to be prepared. The trial was continued until May 22, 2000.

On April 14, 2000, the State filed a second motion to have Shelton declared unavailable and requesting that his prior testimony be admitted. Attached to this motion was another letter from Captain Watson stating that Shelton would be deploying to Kosovo for six months on April 28, 2000, and that he would be unavailable for trial. The trial court granted this motion and ruled that the State would be able to introduce Shelton's testimony at the preliminary hearing and at the suppression hearing as substantive evidence at Hamilton's trial.

Again Hamilton's trial was continued. A few days before the new trial date of January 8, 2001, the State filed a third motion to declare Shelton unavailable. In relevant part, this motion stated that:

6. Around the beginning of November [2000], Mr. Shelton returned to Germany from Kosovo. He immediately began having discipline problems including being absent-without-leave.

7. From conversations with Mr. Shelton's commander prior to the Christmas holidays, the State learned that Mr. Shelton would not be allowed to travel and in fact, did not wish to travel.

8. On January 2, 2001, the State learned that the situation had changed. Mr. Shelton was willing to travel if he could go through Atlanta, Georgia. His commander stated that he would be allowed to travel, but it was too late for any flights through Atlanta. Since that date, the State has been unable to contact Mr. Shelton.

The State respectfully submits that Mr. Shelton is beyond the reach of Tennessee's subpoena power. Only by his full cooperation and mature decisions and behavior on his part could the logistical problem of getting Mr. Shelton to Nashville for this trial be solved. Because of his location and behavior, the problem remains unsolved. The State of Tennessee still wishes to prosecute [the Defendant] and asks that the Court grant this motion.

The State presented no documents or evidence in support of the motion. Nonetheless, the trial court granted the State's motion and admitted Shelton's prior testimony at trial.

On January 8, 2001, Hamilton was tried in Tennessee state court on four charges, including the armed robbery of Shelton. The State introduced transcripts of Shelton's prior testimony. Woodard testified that he saw Hamilton holding a gun and saw him rob Shelton. Woodard testified that he was "sure" Hamilton was the robber and denied any participation. Detective Malone testified regarding the police investigation and the results of the photographic line-ups. The jury returned a guilty verdict on two of the four charges - evading arrest and the armed robbery of Shelton. The court sentenced Hamilton to seven and nineteen years, respectively, to run consecutively, for a total sentence of twenty-six years.

Hamilton timely appealed his armed robbery conviction, arguing that he was deprived of his federal Sixth Amendment right of confrontation when the trial court declared Shelton unavailable and admitted his prior testimony. The Tennessee Court of Criminal Appeals (TCCA) denied relief. Subsequently, the Tennessee Supreme Court summarily dismissed Hamilton's petition.

Hamilton then filed a habeas petition under 28 U.S.C. § 2254 in the district court, raising the same Confrontation Clause claim. The district court granted Hamilton permission to serve certain interrogatories and requests for production on the State regarding the "unavailability" question and later to amend the record. The district court denied the petition for habeas corpus, but it granted Hamilton a certificate of appealability on the Confrontation Clause issue.

## II. Analysis

### A. Standard of Review

We review the legal conclusions of the district court sitting in habeas *de novo* and the factual findings of both the state trial and appellate courts for clear error. *Brumley v. Wingard*, 269 F.3d 629, 637-38 (6th Cir. 2001) (internal citations omitted). Because Hamilton's habeas petition was filed after April 24, 1996, our review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 1996, Pub. L. No., 104-132, 110 Stat. 1214 (1996). *See Calvert v. Wilson*, 288 F.3d 823, 827 (6th Cir. 2002). AEDPA provides that a federal court may not grant a petition for writ of habeas corpus unless the state court adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" as determined by the Supreme Court. *Id.*; 28 U.S.C. § 2254(d).

The issues of the unavailability of the witness and the reasonableness of the State's efforts to produce the witness are parts of the Confrontation Clause under the Sixth Amendment. Although our court does not have a published opinion on the standard of review for such a question, other circuits have held that these questions are mixed questions of law and fact and reviewed de novo.

*See, e.g., Barrett v. Asevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999)(en banc); *McCandless v. Vaughn*, 172 F.3d 255, 265 (3d Cir. 1999).   We, therefore, adopt that standard.

## B.  The State's Efforts to Procure Witness Shelton for Trial Were Reasonable

The threshold issue for consideration is Hamilton's complaint that the State did not make a good faith effort to obtain Shelton for trial.  Hamilton primarily points to the State's third motion to declare Shelton unavailable, which was based on the prosecutor's conversations with Shelton's commander revealing that Shelton would not be allowed to travel due to discipline problems and that Shelton did not desire to travel, and to information developed on January 2, 2001, that Shelton was willing  to travel to the United States, but only if he were routed through Atlanta.

The Confrontation Clause of the Sixth Amendment strives to ensure that a criminal defendant may have a jury assess the prosecution's witnesses "face to face."  *Mattox v. United States*, 156 U.S. 237, 242-43 (1895); U.S. Const. amend. VI. ("[I]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.").  Thus, the prosecution may not substitute former testimony for live testimony unless the government first demonstrates that the witness remains unavailable for trial proceedings.  *Ohio v. Roberts*, 448 U.S. 56, 65 (1980), *overruled on other grounds*, *Crawford v. Washington*, 541 U.S. 36 (2004).  The unavailability exception contains two requirements.  First, the exception mandates that the witness's testimony was given at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant. *Crawford*, 541 U.S. at 54 ("[T]he common law in 1791 conditioned admissibility of an absent witness's examination on . . . a prior opportunity to cross-examine.  The Sixth Amendment therefore incorporates [that] limitation[].").  Second, a witness cannot be deemed unavailable for purposes of the exception unless the government has made a good faith effort to obtain her presence at the trial proceedings.  *Roberts*, 448 U.S. at 74.

*Roberts* further refined the good faith standard, explaining that good faith efforts are context-specific:

> The law does not require the doing of a futile act.  Thus, if no possibility of procuring the witness exists . . . "good faith" demands nothing of the prosecution.  But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation.  The lengths to which a prosecution must go to produce a witness is a question of reasonableness.  The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness.  As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate.

*Id*. at 74-75 (internal citations and quotations omitted).

If the desired witness is beyond the subpoena power of the trial state but an established procedure of voluntary cooperation exists, then the government must go to reasonable lengths to utilize that procedure to locate, contact, and arrange to reasonably transport the witness. *Barber v. Page,* 390 U.S. 719, 720 (1968), considered the constitutionality of the trial court's admittance of preliminary hearing testimony of a witness who at the time of trial was incarcerated in a federal prison in Texas.  The state in *Barber* made no efforts to procure the witness for trial after ascertaining that he was in a federal prison outside Oklahoma, the prosecuting state. *Id.* at 723.  Although the previously accepted rule was that confrontation is unnecessary if a witness - outside the jurisdiction of the trial court - could not be compelled to trial, the Court discredited that view. *Id.*  It noted that a federal statute grants federal courts the power to issue writs *ad testificandum* at the request of state prosecutors, and that the United States Bureau of Prisons permits federal prisoners to testify in state court criminal proceedings pursuant to writs *ad testificandum* issued out

of state courts. *Id.* at 724. The state prosecution's failure to pursue the witness was unreasonable, because "the possibility of a refusal is not the equivalent of asking and receiving a rebuff." *Id.* (internal citations and quotations omitted). Thus *Barber* held that "a witness is not 'unavailable' for purposes of the foregoing exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Id.* at 724-25; *see also Brumley*, 269 F.3d at 641 (finding a lack of good faith where the prosecution failed to utilize the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings to secure a witness housed in prison in a different state).

If, however, the witness is beyond the subpoena power of the prosecuting state and no established means of communication and voluntary cooperation exist for procuring the witness, the government arguably need not even seek a rebuff. *See Mancusi v. Stubbs*, 408 U.S. 204 (1972). In *Mancusi*, a victim who testified at the first trial left the country and became a permanent resident of Sweden. At the second trial, the state issued a subpoena to the victim's last known address in Texas. *Mancusi* compared the availability of procedures and policies detailed in *Barber* allowing state prosecutorial authorities to compel the attendance of witnesses residing in other states with the lack of availability of such procedures for witnesses living in other countries. *Id.* at 212. Because no such procedures existed, the Court stated that "Tennessee . . . was powerless to compel his attendance . . . either through its own process or through established procedures." *Id.*

Considered *in toto*, the relevant evidence supports a finding of reasonableness with respect to the prosecution's efforts. First, Hamilton does not identify any previously established means of procuring Shelton to testify at trial, unlike the statutory procedures available to the state in *Barber* and *Brumley*. In contrast to the witness in *Barber*, Shelton was serving in the army overseas; he was not incarcerated in a federal prison in a different state. Therefore the available statutory procedures for securing incarcerated witnesses for trials in other states do not apply to Shelton. Moreover, besides the "procedure" of contacting Shelton's commanding officer in Germany and requesting Shelton's presence at trial, neither Hamilton nor the State identifies any predetermined policies or procedures that the State could – or should – have utilized to bring Shelton to Tennessee for Hamilton's trial.

Second, the State worked diligently to produce Shelton, right up until the time of trial. On January 2, 2001, the prosecution learned that Shelton was willing to travel if he could go through Atlanta, Georgia. However, Shelton's commander advised that it was too late to arrange any flights for Shelton from Germany through Atlanta in the days remaining before trial.[1]

Hamilton insists that the State unreasonably abandoned its efforts to arrange Shelton's presence *after* Shelton agreed to travel to the United States. He avers that rather than investigating commercial flights and travel plans that would include a layover in Atlanta, the State "gave up." He argues that a number of possible explanations that the State might offer for failing to produce Shelton at trial - *inter alia*, that the expense of last-minute international travel was prohibitive, that Shelton's condition on flying through Atlanta constituted a rejection of the State's offer, or that the

---

[1] These facts were taken from the State's third motion to declare the witness unavailable and to use his former testimony at trial. The dissent relates several more detailed facts, which have been discovered through the interrogatories before the district court on the petition for a writ of habeas corpus. Although the recitation of some of the facts by the dissent are not erroneous, they were not facts which were known to the Tennessee courts when they made their decisions. Some of the facts which subsequently were produced in the district court through the interrogatories are of some use in buttressing Hamilton's case, and other facts are useful in supporting the position of the State that it proceeded in good faith. For example, the motion to declare the witness unavailable did not relate that the prosecutor had spoken to Shelton on January 2, 2001, although the interrogatory indicates that the prosecutor had talked to Shelton on that date. However, the interrogatory also shows that the prosecutor attempted to reach Shelton through the rest of the week up to the time of the trial, but was unsuccessful in doing so. Likewise, the prosecutor indicated in his interrogatory that he attempted to reach Shelton's commander through the rest of the week but was unable to talk to him before the trial.

prosecutor was not responsible for the lateness of his efforts because he had been informed previously that Shelton would not be able or willing to travel to trial - are excuses concocted to obscure the State's failure to take the steps necessary to protect Hamilton's constitutional rights. However, this argument lacks a factual basis and thus amounts to no more than mere speculation. Indeed, the record reflects that the State did not abandon its efforts; rather, the State continued to attempt to reach Shelton throughout the week leading up to Hamilton's trial but was unable to speak with him before the trial date. [2]  Moreover, the motion by the State averred that it was too late to arrange "any flights through Atlanta" prior to trial.

As the TCCA found, the State's efforts here were reasonable, based in part on the steps taken to secure Shelton months in advance of the trial. Those efforts were thwarted:  first, by Captain Watson's refusal to permit Shelton to travel to the United States to testify due to his previous discipline problems and absences without leave; and second, by Shelton's deployment to Kosovo for six months. The State's first two motions to declare Shelton unavailable were accompanied by letters from Shelton's commanding officer indicating the difficulties with securing his presence at trial. This evidence buttresses the State's position, despite the absence of evidence submitted to the trial court in support of its third and final motion to  admit Shelton's prior testimony. *See United States v. Sindona*, 636 F.2d 792, 804 (2d Cir. 1980)  ("Although it would have been preferable to present the court with affidavits, the fact that trial counsel for the Government presented the factual situation orally is not fatal.  It is proper for the court to accept, in its discretion, the representations of counsel with respect to the availability of a witness."). [3]

For these reasons, the TCCA correctly concluded  that the State went to reasonable lengths to secure Shelton's presence at Hamilton's trial.

## C. **The State Appellate Court Did Not Err in Finding the State's Efforts Reasonable**

Hamilton next argues that the TCCA erred in ruling that the State satisfied its obligations of good faith and reasonableness in attempting to arrange for Shelton's trial appearance. He complains that the TCCA summarily concluded that Shelton was unavailable because his commanding officer asserted he would return to Germany after his tour of duty in Kosovo, and because Germany was beyond the subpoena power of the Tennessee criminal courts. Hamilton asserts that this conclusion runs "contrary to" the law as established by *Barber* and *Roberts* [4] because, in his view, there was an established procedure for procuring Shelton's voluntary cooperation. As discussed above, however,

---

[2] This fact was developed through the interrogatories in the district court.  The Tennessee trial court apparently did not know that the State had continued to try to reach Shelton and his commander between January 2, 2001, and the trial date, January 8, 2001.

[3] The dissent correctly quotes the decision of the TCCA when it said:  "Proof of the witness's unavailability must consist of more than the prosecutor's own statements to the court."  Nevertheless, the TCCA considered the prosecutor's statements in his motion to declare the witness unavailable plus previous statements and letters which had been filed on the prior dates on which the trial was set. It was up to the Tennessee courts to determine the type of proof or statements required to carry the State's burden of proof under the criteria from *Ohio v. Roberts*, 448 U.S. 56, 75 (1980).  The dissent criticizes the TCCA for not having followed the burden of proof requirement  from *Roberts*. Although the TCCA did not cite that case, nevertheless, upon a full reading of the opinion, it is clear that the court properly placed the burden on the prosecution to show the unavailability of Shelton.

[4] In *Roberts*, the prosecution issued five subpoenas to the desired witness at her parents' home, located within the state of Ohio.  448 U.S. at 75.

no established procedure akin to those of *Barber* and *Roberts* existed in this case.[5] The prosecutor, on his own, initiated contact with Shelton and his commanding officer in Germany to obtain their cooperation, which was not forthcoming. Rather, the findings of the TCCA are germane to the issue of unavailability because they relate to the *absence* of an established procedure for obtaining Shelton's cooperation. The district court properly found that the TCCA's decision was not contrary to nor an unreasonable application of the governing federal law, even considering the supplemental information added to the record before the district court.

**AFFIRMED.**

---

[5]At oral argument, counsel for the defendant noted that the Walsh Act of 1964, 28 U.S.C. § 1783, literally permits a United States court to order the issuance of a subpoena to a necessary witness in a foreign country:

> A court of the United States may order the issuance of a subpoena requiring the appearance as a witness before it, or before a person or body designated by it, of a national or resident of the United States who is in a foreign country, or requiring the production of a specified document or other thing by him, if the court finds that particular testimony or the production of the document or other thing by him is necessary in the interest of justice, and, in other than a criminal action or proceeding, if the court finds, in addition, that it is not possible to obtain his testimony in admissible form without his personal appearance or to obtain the production of the document or other thing in any other manner.

28 U.S.C. § 1783(a).

However, the applicability of this act was not raised prior to oral argument; thus, we deem the issue waived. *See Bickel v. Korean Airlines Co.*, 96 F.3d 151, 153 (6th Cir. 1996) ("We normally decline to consider issues not raised in the appellant's opening brief.") (internal quotations and citation omitted).

—————————

**DISSENT**

—————————

KAREN NELSON MOORE, Circuit Judge, dissenting. The key issue in this case is whether the state trial court was justified in admitting Quan Shelton's testimony from a preliminary hearing and a suppression hearing because he was unavailable to testify at the January 8, 2001 trial. The answer turns on whether the prosecutor (Bret Gunn) carried his burden of demonstrating that he made reasonable, or "good faith," efforts to obtain Shelton's presence at the January 2001 trial. *Barber v. Page*, 390 U.S. 719, 724-25 (1968) ("[A] witness is not 'unavailable' for purposes of the . . . exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial.").

Although the majority opinion correctly applies the de novo standard of review to the state court's determinations of unavailability and reasonableness, it concludes that the prosecutor met his burden, notwithstanding the fact that he submitted *no evidence* in support of his motion to declare Shelton unavailable. Because the majority's decision effectively eradicates the burden of proof that the Supreme Court established, I respectfully dissent.

## I.  THE REASONABLENESS OF GUNN'S EFFORTS

The reasonableness of a prosecutor's efforts to procure a witness is context-dependent. As the United States Supreme Court put it, "[I]f no possibility of procuring the witness exists (as, for example, the witness' intervening death), 'good faith' demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation." *Ohio v. Roberts*, 448 U.S. 56, 74 (1980). *See also McCandless v. Vaughn*, 172 F.3d 255, 266 (3d Cir. 1999) ("Reasonableness . . . must be evaluated with a sensitivity to the surrounding circumstances and the defendant's interest in confronting the absent witness."); *Cook v. McKune*, 323 F.3d 825, 835 (10th Cir. 2003) ("[E]valuation of reasonableness or good-faith effort 'requires us to consider all the circumstances rather than to apply a per se rule.'" (quoting *Martinez v. Sullivan*, 881 F.2d 921, 924 n.1 (10th Cir. 1989))). Likewise, when a witness is key to the prosecution's case, more is demanded of the prosecution than in cases involving the unavailability of a relatively unimportant witness. *United States v. Quinn*, 901 F.2d 522, 529 (6th Cir. 1990) (citing *United States v. Lynch*, 499 F.2d 1011, 1022 (D.C. Cir. 1974)). *Cf. Dorsey v. Parke*, 872 F.2d 163, 166 (6th Cir. 1989) ("Where the trial court has curtailed a defendant's cross-examination of a 'star' government witness . . . its ruling must be more carefully scrutinized.").

The majority opinion recognizes that context is key to this inquiry, but avoids confronting inconvenient facts that are crucial to the context in which Bret Gunn, the prosecutor, acted.

To determine whether the prosecution's efforts to procure Shelton's presence at Hamilton's trial were reasonable, we must consider the circumstances surrounding Shelton's absence. First, it is vital to note that Shelton was the prosecution's key witness for its aggravated robbery charge—Shelton was the victim of the robbery, as well as the only witness who indicated that Hamilton pointed a gun at him. This contextual fact mandates requiring much from the prosecution before concluding that Shelton was, in fact, unavailable.

Next, we must consider the facts indicating *why* Shelton failed to appear at the January 2001 trial. Around December 1999, the prosecution learned that Shelton, who had since joined the military, was stationed in Germany. J.A. at 376 (State's Jan. 7, 2000 Mot. to Declare Witness Unavailable ¶ 1). When Gunn contacted Shelton's commanding officer prior to the January 2000

trial date, Gunn learned that Shelton had been absent without leave several times, and was considered a flight risk. *Id.* ¶ 2; J.A. at 438 (Letter erroneously dated Jan. 6, *1999* from Capt. Watson). For this reason, Shelton's commanding officer did not permit him to testify in Nashville in January 2000. Gunn moved the court to declare Shelton unavailable for the January 2000 trial, and to permit the prosecution to read into the trial record Shelton's prior testimony from the preliminary hearing and suppression hearing. J.A. at 376 (State's Jan. 7, 2000 Mot. to Declare Witness Unavailable ¶ 2). Gunn attached correspondence with Shelton's commanding officer as evidence to support the motion, which the trial court granted. *See* J.A. at 48-49 (Tenn. Ct. Crim. App. Op.). Ultimately, however, the trial court continued the trial date until May 22, 2000. J.A. at 379 (State's Apr. 19, 2000 Mot. to Declare Witness Unavailable ¶ 3).

Gunn again contacted Shelton's commanding officer, and again learned that Shelton would be unavailable to testify at trial in May 2000, this time because Shelton would be deployed to Kosovo until the fall of 2000. *Id.* ¶ 4. Again, Gunn moved the court to declare Shelton unavailable, and again Gunn attached as evidence his correspondence with Shelton's commanding officer. J.A. at 381 (Letter dated Apr. 13, 2000 from Capt. Watson to B. Gunn). The court granted the motion, J.A. at 383 (St. Crim. Ct. Order dated May 11, 2000), but later continued the trial date until January 8, 2001. J.A. at 385 (State's Jan. 2, 2001 Mot. to Declare Witness Unavailable ¶ 5).

Gunn was aware that Shelton was due to return to Germany in October 2000 and that Gunn would have several months between Shelton's return and the trial to procure Shelton's attendance. In September 2000, Gunn received word from Shelton's commanding officer that Shelton's discipline problems had vanished, and that Shelton "was being considered for some type of commendation." J.A. at 433-34 (Gunn's Response to Interrogatory No. 9). Yet Gunn had only one conversation with either Shelton or his commanding officer between Shelton's return from Kosovo and Christmas. J.A. at 430 (Gunn's Response to Interrogatory No. 5). During this conversation, Gunn learned that Shelton was neither willing, nor permitted by his commanding officer, to travel to Nashville. J.A. at 434 (Gunn's Response to Interrogatory No. 9). Nonetheless, Gunn contacted Shelton again on January 2, 2001—just six days before trial—and then learned that Shelton was allowed to travel *and willing to do so* if he could travel through Atlanta.[1] *Id.* According to Gunn, he spoke with Shelton's commanding officer, who said it was too late to arrange for *military* travel through Atlanta. *Id.* The record reveals no inquiry into whether *commercial* flights were available.[2]

Given the importance of Shelton's testimony to the State's case, as well as the importance of Hamilton's Sixth Amendment right to confront adverse witnesses at trial, it is difficult to see how these efforts could be considered reasonable. We previously have characterized more zealous efforts as "singularly unenthusiastic." *Quinn*, 901 F.2d at 528. In *Quinn*, the government's attempts included two visits to an apartment, conversations with multiple people, and a drive-by and a visit to another house. *Id.* Crucial to our determination in *Quinn* that the prosecution's efforts did not amount to good faith were (1) the short time between the beginning of efforts to procure the

---

[1] That Gunn bothered to call Shelton back after purportedly receiving a categorical "no" from both Shelton and Shelton's commanding officer indicates that the pre-Christmas rejection likely was not as categorical as the State now claims.

[2] I find it deeply troubling that in the State's Third Motion to Declare Shelton Unavailable, filed on January 2, 2001, the State omitted the distinction between military flights and commercial flights. Rather than specify that Shelton's commanding officer noted that it was too late to arrange for a *military* flight through Atlanta, the State's motion says that Shelton's "commander stated that . . . it was too late for *any* flights through Atlanta." J.A. at 386 (emphasis added). Not until he responded to interrogatories in this habeas proceeding did Gunn clarify that "Mr. Shelton's commanding officer . . . [said] that there were no *military* flights that could accommodate a passenger to Atlanta from Germany in the short time remaining before trial." J.A. at 434 (Gunn's Response to Interrogatory No. 9) (emphasis added). Gunn's failure to draw this distinction in his third motion and his failure to clarify the issue in addressing the state court strongly suggests that his efforts were less than reasonable, and that is the issue that we must decide today.

witness's attendance and the trial date and (2) the lack of follow-up with the people contacted.  *Id.* Similarly, Gunn's attempts to procure Shelton's attendance did not begin in earnest until just *six days before trial*, and Gunn failed to follow up by looking into the availability of commercially available flights.  If the government's efforts over the course of a week to locate the witnesses in *Quinn* were unenthusiastic, the two phone calls that Gunn made to Shelton over the course of two months were downright apathetic.

The majority brushes away these concerns, pointing to four putative reasons for concluding that Gunn's efforts were reasonable.  First, the majority opinion claims that Hamilton has not identified a previously established means of procuring Shelton.  Maj. Op. at 5.  This claim is dubious, as it is directly undercut by two inconvenient facts:  (1) Gunn bothered to contact the military to inquire into Shelton's availability and (2) Shelton's commanding officer indicated that Shelton would not be *permitted* to travel to Tennessee to testify *because of his prior AWOL status*. These facts cut strongly against the majority opinion's assertion that there were "no means of communication and voluntary cooperation" sufficient to procure an enlisted soldier serving overseas for testimony at trial.  Were the majority correct, either (1) Gunn would have been unable to initiate such contact or (2) the commanding officer's reply would have been a terse, "We don't allow that–ever."[3]

The majority distinguishes *Barber v. Page*, 390 U.S. 719 (1968), on the basis that in this case, the State lacked a *statutory* basis to *compel* Shelton's presence at trial.  In so doing, the majority opinion conflates the "established procedures" mentioned in *Mancusi v. Stubbs*, 408 U.S. 204, 212 (1972), with *statutory* procedures.  However, the Supreme Court has rejected the argument that "because the State would have had to request an exercise of discretion on the part of federal authorities, it was under no obligation to make such a request."  *Barber*, 390 U.S. at 724.  Further, no case holds that procedures are not "established" for purposes of this analysis unless they are embodied in a statute.  I can see no reason that the absence of a statutory procedure to compel Shelton's presence at trial should relieve the prosecution of its duty to make a good-faith effort to bring Shelton to the trial in Nashville.  As noted above, apparently Gunn also understood his duties to be more robust.  Otherwise, why would he even have tried to contact Shelton after Shelton had gone overseas with the military?

Next, the majority claims that the prosecution "worked diligently to produce Shelton, right up until the time of trial."  Maj. Op. at 5.  The only effort supporting the asserted diligence is a phone call to Germany within a week of the trial date.  As noted above, the record does not indicate that the prosecution explored the availability of commercial flights, and the extent of follow-up with Shelton or his commanding officer is unclear at best.[4]  I cannot accept the notion that an isolated phone call within a week of trial constitutes diligence.

Third, the majority opinion asserts that "the State continued to attempt to reach Shelton throughout the week leading up to Hamilton's trial but was unable to speak with him before the trial

---

[3]Further, Captain Watson's January 6, 2000 letter explicitly states that an established means of communication and voluntary cooperation existed when it notes that the American Red Cross contacted her "in reference to a subpoena from the State of Tennessee for Private Shelton to appear in court as a witness."  J.A. at 438.

[4]In his response to interrogatories, Gunn indicated that he "continued to try and reach Mr. Shelton's commanding officer through the rest of the week [of January 2, 2001] but . . . was unable to talk with him again before the trial on Monday, January 8, 2001."  J.A. at 434 (Gunn's Response to Interrogatory No. 9).  For some reason, Gunn did not mention these efforts during the January 5, 2001 pretrial hearing, at which the trial court granted the State's motion to declare Shelton unavailable.  J.A. at 417-25 (Pretrial Hr'g Tr.).  Perhaps the efforts referred to in the interrogatory response occurred during the weekend between Friday, January 5 and Monday, January 8.  It is unclear why this would be the case, though, as the court had already declared Shelton unavailable on January 5.

date." Maj. Op. at 6.  As indicated previously, I am unable to find credible support for this assertion in the record.  *See supra note* 4.

Finally, the majority opinion points to the prosecution's efforts to procure Shelton's attendance at the January 2000 and May 2000 trial dates as evidence of reasonable efforts to bring Shelton to the January 2001 trial.  Maj. Op. at 6.  The majority misconstrues the issue.  At issue in this case is the reasonableness of the prosecution's efforts to obtain Shelton's presence *at the January 2001 trial*.  While the prosecution's efforts anent the earlier trial dates are part of the context in which we determine the prosecution's good faith, they cannot, in and of themselves, establish that the prosecution's lackluster efforts to get Shelton to testify at the January 2001 trial were reasonable.

Accordingly, none of the majority opinion's proffered reasons support its conclusion that Gunn's efforts to protect Hamilton's right to cross-examine Shelton were reasonable.

## II.  HABEAS STANDARD

Of course, erroneously concluding that the prosecution's efforts were reasonable is of no consequence unless the state court's decision was contrary to clearly established Supreme Court precedent or an unreasonable application of such precedent to the case at bar.  *See* 28 U.S.C. § 2254(d)(1).  In this case, the Tennessee Court of Criminal Appeals (TCCA)'s analysis was both contrary to, and an unreasonable application of, clearly established Supreme Court precedent.

When the TCCA considered this case, the controlling precedent was *Ohio v. Roberts*, 448 U.S. 56 (1980),[5] which clearly requires that "the prosecution bears the burden of establishing" that a witness is unavailable.  *Id*. at 75.  The TCCA does not clearly recognize that it is the prosecution that has the burden of persuasion with regard to unavailability.  The closest the state court comes is its statement that "Proof of the witness's unavailability must consist of more than the prosecutor's own statements to the court."  J.A. at 50 (Tenn. Ct. Crim. App. Op. at 4).  In any event, it is clear that the TCCA failed to apply the *Roberts* standard.

As the majority opinion twice acknowledges, *see* Maj. Op. at 3, 6, the prosecution provided *no evidence*—no phone records, no letter correspondence, not even an affidavit—supporting its motion to declare Shelton unavailable to testify at the January 8, 2001 trial.[6]  This, too, is a fact that the TCCA recognized.  J.A. at 50 (TCCA Op. at 4).  But the TCCA affirmed the trial court's decision to grant the State's motion anyway, and thus failed to place the burden of proof on the prosecution, as *Roberts* requires.  By failing to place the burden of proving Shelton's unavailability on the State, the TCCA applied a standard that is contrary to clearly established Supreme Court precedent.

---

[5]Although the Supreme Court subsequently overruled *Roberts* in *Crawford v. Washington*, 541 U.S. 36 (2004), we apply *Roberts* because *Crawford* post-dates the TCCA's opinion.  *See Brumley v. Wingard*, 269 F.3d 629, 638 (6th Cir. 2001) ("In reviewing a state court decision under [§ 2254], we look only to the Supreme Court holdings that existed at the time of the state court's decision." (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000))).

[6]The majority opinion, while acknowledging this lack of evidence, cites *United States v. Sindona*, 636 F.2d 792, 804 (2d Cir. 1980), for the proposition that the court may accept representations of counsel in lieu of evidence regarding a witness's availability.  Maj. Op. at 6.  Setting aside the conflict between this proposition and the standard the TCCA applied, *see* Maj. Op. at 6, n.3, I sincerely doubt that *Sindona* is valid law on this point.  Although the Second Circuit decided *Sindona* six months after the Supreme Court announced the burden-of-proof requirement in *Roberts*, the *Sindona* court cited *Bailey v. Southern Pacific Transportation Co.*, 613 F.2d 1385 (5th Cir. 1980)—a case decided before *Roberts*—in support of the proposition the majority opinion quotes.  As *Bailey* is not viable on this point in light of *Roberts*, neither is *Sindona*.  In any event, a 1980 out-of-circuit case is certainly not binding on us, and we should not follow it.

The TCCA, as well as the majority opinion, attempts to paper over this problem by pointing to the evidence that the State supplied in support of its earlier motions to declare Shelton unavailable to testify. To the extent that the TCCA relied on the evidence that the State had submitted in support of its motions to declare Shelton unavailable for the January 2000 and May 2000 trial dates, this is an objectively unreasonable application of *Roberts*.

The unreasonableness of this analysis becomes clear once we consider what the previously proffered evidence actually demonstrates. The January 2000 evidence demonstrates that in January 2000, Shelton's disciplinary record led the military to conclude that he was a flight risk, and that the military would not let him travel *at that time because he was considered a flight risk*. Likewise, the evidence in support of declaring Shelton unavailable for the May 2000 trial shows that Shelton would be deployed in Kosovo from April through October 2000. None of this previously proffered evidence demonstrates in any way that Shelton would be unavailable to testify in January 2001. Indeed, neither of the reasons for the military's previous refusals applied in January 2001, as Shelton had returned from deployment to Kosovo and was no longer considered a flight risk. The evidence attached to the previous motions may indicate that bringing Shelton to Nashville to testify would be difficult, but difficulty is hardly tantamount to unavailability. By relying on evidence that bears infinitesimal, if any, relevance to whether Shelton was available to testify in January 2001, the TCCA unreasonably applied *Roberts*'s burden-of-proof standard.

The majority opinion bends over backwards to accommodate the TCCA's decision to ignore *Roberts*'s burden-of-proof requirement, claiming that "[i]t was up to the Tennessee courts to determine the type of proof or statements required to carry the State's burden of proof under the criteria from *Ohio v. Roberts*." Maj. Op. at 6, n.3. Not so. The majority cites no authority for this bewildering proposition of law, and for good reason: the majority's position completely eradicates the *Roberts* standard. According to the majority, state courts are free to undercut a burden-of-proof requirement established by the Supreme Court by allowing a prosecutor to sustain his burden with *no evidence*. Similarly, according to the majority, the state is free to conclude that a constitutionally required burden of proof is met when the government references, but does not include, evidence that is plainly irrelevant to the issue in question. The majority's unprecedented deference to the state courts effectively erases the burden-of-proof requirement from *Roberts*, and with it, the Supremacy Clause from the text of the Constitution. This I cannot countenance.

### III. HARMLESS ERROR

Finally, I believe these errors were not harmless, and accordingly, we should reverse the district court's judgment. "On collateral review, an error is deemed harmless unless it 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Stapleton v. Wolfe*, 288 F.3d 863, 867 (6th Cir. 2002) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). If the court is uncertain, but has "'grave doubt' as to the harmlessness of the error, it 'should treat the error, not as if it were harmless, but as if it affected the verdict . . . .'" *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435 (1994)).

Additionally, when evaluating the harmlessness of admitting prior testimony in violation of the Sixth Amendment, courts consider whether *admitting the testimony* had a substantial and injurious effect or influence on the jury, not whether the lack of cross-examination had such an effect. As we have previously indicated, "the proper standard by which to gauge the injurious impact of the admission of constitutionally infirm evidence is *to consider the evidence before the jury absent the constitutionally infirm evidence*." *Brumley*, 269 F.3d at 646 (emphasis added) (citing *Gilliam v. Mitchell*, 179 F.3d 990, 995 (6th Cir. 1999); *Stoner v. Sowders*, 997 F.2d 209, 213 (6th Cir. 1993)).

In Tennessee, aggravated robbery is a robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." TENN. CODE ANN. § 39-13-402(a)(1). As noted previously, Shelton was the key witness in the aggravated robbery case—indeed he was the victim of the alleged robbery—and the only witness who testified that Hamilton pointed a gun at him. Without Shelton's prior testimony, the prosecution's case would have been extremely weak, consisting solely of testimony from Mario Woodard, who was unable to remember the details of the alleged robbery without leading questions:

> Q: Can you describe the person that he [Hamilton] robbed?
> A: No.
> Q: Well, was it a man or a woman?
> A: I guess a man.
> Q: Well, I mean, were you there?
> A: I wasn't there, but I seen—I seen like the end of it.
> [. . .]
> Q: All right, and what was the first thing that you saw take place between the victim and Quinn?
> A: I didn't see nothing.

J.A. at 201-02 (Trial Tr. at 116-17).

Although Woodard eventually recalled some aspects of the transaction after notable prompting from the prosecutor,[7] he never testified that he saw Hamilton point a gun at Shelton, an element of aggravated robbery. The closest he came was his testimony that he saw "Quinn [Hamilton] run towards the other way with a gun in his hand," apparently after the alleged robbery. J.A. at 201 (Trial Tr. at 116). However, even this testimony is vague, as Woodard provided no indication of either the distance or the time elapsed between the alleged robbery and his perception of Hamilton's holding a gun. Due to these omissions, we have no idea when Woodard claimed to have seen the gun. Additionally, the trial transcript is peppered with indications that Woodard had a criminal past that included felonious possession of a weapon, J.A. at 206 (Trial Tr. at 121), and that Woodard had a powerful motive to testify against Hamilton while downplaying his own role in the robbery, J.A. at 205 (Trial Tr. at 120), 207-08 (Trial Tr. at 122-23).

The trial record without Shelton's testimony is hardly the stuff of which an open-and-shut case of aggravated robbery is made. Perhaps a reasonable jury could have convicted Hamilton because Woodard testified that he saw Hamilton run away from Shelton while carrying a gun. Nonetheless, it is difficult to see how the admission of prior testimony from the victim, and sole witness who offered direct evidence of an element of aggravated robbery, could not have had a *substantial and injurious effect or influence* upon the jury's verdict. Because, under harmless error analysis, we consider whether the errantly admitted evidence had such an influence (and not whether a reasonable jury could have voted to convict), I cannot see how this error could be harmless.

## IV. CONCLUSION

Because the state courts did not follow clearly established Supreme Court precedent and because the error almost certainly influenced the jury's verdict, the district court should have granted Hamilton's petition for a writ of habeas corpus. I respectfully dissent.

---

[7]That this prompting was necessary demonstrates just how weak the prosecution's case would appear to a jury without Shelton's testimony. I emphasize it for this reason only.